**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | |
|---|---|
| FIR TREE VALUE MASTER FUND, L.P., | Civ. A. No. |
| Plaintiff, | COMPLAINT |
| -v.- | JURY TRIAL DEMANDED |
| MOHAWK INDUSTRIES, INC., JEFFREY S. LORBERBAUM, BRIAN CARSON, AND FRANK H. BOYKIN, | **ECF CASE** |
| Defendants. | |

# **TABLE OF CONTENTS**

**PAGE**

SUMMARY OF THE ACTION ...................................................................2

JURISDICTION AND VENUE ..................................................................9

THE PARTIES ..........................................................................................10

I.     Plaintiff ..........................................................................................10

II.    Defendants ......................................................................................11

FACTUAL ALLEGATIONS ....................................................................14

I.     Mohawk's Business ........................................................................15

II.    Demand for LVT Soars ...................................................................17

       A.     Mohawk Fails to Gain Market Share in LVT Sales............19

III.   Mohawk Claims to Outperform Market Expectations in 2017 .....20

IV.    Defendants Claim Mohawk's Unparalleled Success in 2017
       Resulted From Legitimate Business Practices and the Quality of
       Its LVT.............................................................................................23

V.     Defendants Obscure Troubling Trends in Inventory and
       Turnover Time with Anodyne Explanations ..................................25

VI.    Mohawk's Fraudulent Schemes.......................................................27

       A.     The Saturday Scam..............................................................33

              1.     Mohawk's Top Executives Carried Out the
                     Saturday Scam..........................................................43

       B.     Mohawk's Other Fraudulent Schemes ................................48

1.     Mohawk Overproduces Product to Cut Per-Unit Manufacturing Costs and Thereby Artificially Inflate Profits and Margins ....................................48

2.     Mohawk Produces Massive Amounts of Defective LVT and Improperly Classifies It as "Inventory" ...................53

3.     Mohawk Knowingly Sells Defective LVT and Denies Legitimate Return Claims............................................60

C.    Mohawk Terminates Its President of Flooring North America ....................................................................................69

VII.  The Truth Is Gradually Revealed & Mohawk's Stock Value Plummets .........................................................................................73

A.    Investors are Shocked When Mohawk Reveals Poor Earnings in Q3 2018..................................................................74

B.    Mohawk Again Stuns Investors By Announcing Terrible Q2 2019 Results .................................................................76

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................78

I.      Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2017 ..................................78

II.     Defendants' Materially False and Misleading Statements and Omissions During the Second Quarter of 2017............................82

III.    Defendants' Materially False and Misleading Statements and Omissions During the Third Quarter of 2017................................86

IV.    Defendants' Materially False and Misleading Statements and Omissions During the Fourth Quarter of 2017............................90

V.     Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2018 ..................................97

VI.    Defendants' Materially False and Misleading Statements and Omissions During the Second Quarter of 2018 ............................... 99

VII.   Defendants' Materially False and Misleading Statements and Omissions During the Third Quarter of 2018 .............................. 101

VIII.  Defendants' Materially False and Misleading Statements and Omissions During the Fourth Quarter of 2018 ........................... 102

IX.    Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2019 ................................ 107

SCIENTER ALLEGATIONS ................................................................ 109

PRESUMPTION OF RELIANCE ........................................................ 114

LOSS CAUSATION ............................................................................ 115

NO SAFE HARBOR ............................................................................ 117

COUNT I    Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants ..................................... 118

COUNT II   Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Against All Defendants .................... 122

COUNT III  Violations of Section 20(a) of the Exchange Act Against the Individual Defendants .................................... 125

COUNT IV   Violations of Georgia RICO, O.C.G.A. Sections 16-14-4(a) and 16-14-4(b) Against All Defendants ................................. 127

COUNT V    Violations of Georgia RICO Conspiracy, O.C.G.A. Section 16-14-4(c) Against All Defendants ...................................... 133

PRAYER FOR RELIEF ...................................................................... 136

JURY DEMAND ................................................................................ 137

Plaintiff Fir Tree Value Master Fund, L.P. ("Plaintiff"), is a purchaser of the publicly traded common stock of Mohawk Industries, Inc. ("Mohawk" or the "Company").  Plaintiff, through its undersigned attorneys, by way of this Complaint and Jury Demand, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Georgia's RICO law, against Mohawk; Mohawk's chief executive officer ("CEO"), Jeffrey S. Lorberbaum ("Lorberbaum"); Mohawk's former President of Flooring North America, Brian Carson ("Carson"); and Mohawk's former chief financial officer ("CFO"), Frank H. Boykin ("Boykin") (collectively, the "Defendants").  Plaintiff bases the allegations herein upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief is based on, *inter alia*, an investigation by its attorneys, which investigation includes, among other things, a review and analysis of: Mohawk's filings with the United States Securities and Exchange Commission ("SEC"); public documents and media reports concerning Mohawk; analyst reports concerning Mohawk; transcripts of Mohawk conference calls and earnings calls; documents filed in the matter *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc.*, No. 4:20-CV-00005-ELR (N.D. Ga.) (the "Class Action"); documents filed in the matter *Maverick Fund, Ltd. v. Mohawk Industries,*

*Inc.*, No. 4:21-CV-00118-TCB (N.D. Ga.) (the "Maverick Opt-Out Action"); and documents filed in the matter *Hound Partners Offshore Fund, LP v. Mohawk Industries, Inc.*, No. 4:22-CV-00073-LMM (N.D. Ga.) (the "Hound Partners Opt-Out Action"). Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

Plaintiff further relies on descriptions of statements by former employees serving as confidential witnesses as set forth in the complaints filed in the Class Action and the Maverick Opt-Out Action. Allegations based on these confidential witness statements were sustained for pleading purposes in the Court's opinion denying Mohawk's motion to dismiss the complaint in the Class Action. These statements – which are largely consistent and corroborative of one another and of other known facts – are set forth with sufficient specificity to warrant Plaintiff's reliance on them.

## SUMMARY OF THE ACTION

1.     Mohawk Industries, Inc. – a Fortune 500 global leader in the production and distribution of soft, hard, and alternative flooring products – repeatedly reported record profits in the lead up to 2017. Front of mind for investors at that time was

whether the Company could sustain these results in 2017 by competing in the burgeoning luxury vinyl tile ("LVT") space that was taking the market by storm. Mohawk purported to satisfy investors' hopes.  In every quarter of 2017, the Company announced "record" sales and operating margins and met or exceeded analysts' forecasts for earnings per share ("EPS").  Mohawk ended 2017 by reporting an "all-time high" of $9.5 billion in full year profits.  During the same time, the Company's share price soared from $201.75 at the year's-start to $275.90 at the year's-end – an extraordinary 37 percent increase.

2.      Unbeknownst to investors, the Company's record-breaking financials were not the product of its executives' diligence and talent, but instead resulted from multiple massive fraudulent schemes carried out at the direction of Mohawk's CEO Jeffrey Lorberbaum and its then President of Flooring North America – the Company's most profitable division – Brian Carson.  As alleged in both the Class and Maverick Opt-Out Actions, former employees have described the Defendants' fraudulent behavior as "***the biggest sham ever***" and as having "***Enron scandal written all over it.***"[1]

3.      The first fraud was a classic example of "channel stuffing." Throughout 2017, and parts of 2018 and 2019, Mohawk was not actually meeting

---

[1] All emphasis herein is added, unless noted otherwise.

its quarterly sales and revenue goals.  So, to artificially inflate these figures Mohawk would ship product scheduled for delivery in a future quarter in the then-current quarter.  Once shipped, the Company would immediately recognize a "sale" and thereby (falsely) boost sales and revenue figures in that quarter – in direct violation of Mohawk's stated revenue-recognition policies and Generally Accepted Accounting Principles ("GAAP").  But Mohawk gave its own unique twist to this classic method for deceiving investors.  To avoid angering or confusing customers with prematurely shipped product, the Defendants deliberately scheduled these shipments on the last Saturday of each quarter – a day on which almost all customers were unavailable to accept or reject shipments.  As a result, approximately 90 percent of the prematurely shipped product came back to Mohawk's warehouses; often on the very same Saturday it was shipped because delivery could not be effected.  Then days later, once the new quarter had started, Defendants would scan the product back into Mohawk's systems as "returned."  Except for the second and third quarters of 2018, Defendants carried out this scam from no later than April 28, 2017 until at least July 25, 2019 (the "Relevant Period").

4.     Mohawk employees who executed the scheme at Defendants' direction caught on.  As a Regional Operations Manager at Mohawk during the Relevant Period stated: "We all realized what this was.  ***This is fixing the numbers.***"

Mohawk's Vice President for Logistics, Dan Flowers, who actively helped perpetrate the fraud, even coined his own phrase for Mohawk's practice of prematurely loading and shipping product – he would tell employees at the quarter's-end, **time to "drain the swamp."**  Mohawk employees grew tired of loading (and soon after unloading) millions of pounds of product onto trucks at quarter's-end that was never intended to be delivered.  So, over time the scheme became more and more brazen and culminated in employees not even loading product onto trucks to be shipped.  Instead, workers simply walked around Mohawk's distribution centers and scanned product as "shipped," thereby generating "sales."  Then just days later, in the new quarter, employees would walk around the warehouses again and re-scan the same product as "returned."  A Distribution Center Manager at Mohawk during the Relevant Period recalled: "We [would] just scan it without moving anything because there was no point.  Nothing ever got delivered anyways.  **It was all fake.**"

5.      This scheme – the "Saturday Scam" – was carried out at every Mohawk distribution center in the country, involved virtually all of the Company's products, and was inflicted on nearly all of Mohawk's customers.  In each quarter in which the scheme operated, it resulted in improper recognition by Mohawk of material amounts of revenue and sales in violation of basic GAAP, and created immediate revenue and sales deficits in the following quarter when all of the "returns" were

processed.  As Mohawk's Distribution Center Manager recounted: "The week after the end of a quarter would bury us in returns for all these fake deliveries."  The need to remedy this self-inflicted wound every quarter created a vicious cycle that only encouraged more fraudulent behavior.

6.      Indeed, throughout the Relevant Period Defendants also perpetrated other frauds to artificially inflate Mohawk's profits, sales, and margins.  ***First***, at Defendants' direction, Mohawk workers would perform excessively long production "runs" to overproduce goods – despite a lack of extra sales demand.  One former employee recounted that Mohawk was drowning in so much excess product during the Relevant Period that the Company had to rent "109 trailers" and 300,000 square feet of warehouse space to store it all.

7.      The Defendants committed this fraud to cut per-product manufacturing costs and thereby artificially increase profits and margins in the then-current quarter.  Mohawk's Senior Vice President for Sales during the Relevant Period explained:  "***We all knew they were cooking the books.***  This wasn't just risky decisions. . . .  ***We just lied about the numbers and the stock went up.***"

8.      ***Second***, during the Relevant Period Mohawk was producing massive amounts of defective LVT, a product whose demand was soaring during that time.  LVT is a type of flooring that mimics other conventional floor surfaces, such as

carpet or hardwood, but purportedly provides superior longevity and is easier to maintain and install.  LVT is also cheaper than traditional flooring.  LVT's blend of aesthetic appeal, durability, and affordability caused demand for it to surge in the years leading up to and during the Relevant Period.  Nonetheless, Mohawk's LVT mills were plagued with problems and roughly 50 percent of what they produced was unsalable scrap.

9.     Defendants were determined to conceal these problems from investors and deliberately chose *not* to take a write-down on the Company's junk LVT – as required by GAAP.  Instead, according to former employees, Mohawk booked its defective LVT as "inventory" and put "a code" on the LVT to signal it should not be shipped out.  This served to artificially inflate Mohawk's profits and margins, and hide from investors the Company's pervasive LVT quality-control problems (and thus effective inability to compete in the LVT market).

10.     ***Lastly***, despite Mohawk's attempts to not ship out defective LVT, the Company nevertheless sold much of its junk LVT to customers and labeled it "first quality."  Then, when returns came pouring in, Mohawk implemented a fraudulent claim denial strategy.  These schemes provided Mohawk another means to artificially boost its financials.

11.     As former employees quoted in the Class and Maverick Opt-Out Actions explained, during the Relevant Period retailers were returning 25 to 50 percent of Mohawk's LVT because it was defective, and eventually stopped carrying the Company's products altogether.  Mohawk's distributors were also returning "truckloads" of Mohawk's LVT and were outraged.  A Regional Distribution Sales Manager who sold LVT to some of the Company's largest distributors during the Relevant Period explained: "Everybody got bad material across the country," and "Everyone who took product [was] complaining about it."  These problems tarnished Mohawk's reputation and consequently reduced the salability of other Mohawk products.

12.     The Company also began denying legitimate return claims for its defective LVT as early as 2017.  According to former employees, Company executives instructed Mohawk employees to categorically deny all return claims. "[T]hey'd deny, deny, deny until someone gets a lawyer involved," a former employee explained, "*[t]he claims people were told to deny everything.*"  Mohawk's scams of selling junk product that it labeled "first quality" and then rejecting legitimate return claims predictably destroyed its relationships with key customers. For example, between 2017 and 2019, some of the largest home building companies in the U.S. severed ties with Mohawk.

13.     During the Relevant Period, Defendants repeatedly made false and misleading statements and omissions to conceal from investors: (i) the aforementioned fraudulent schemes, which were the true reasons for the Company's "record" financial figures and ballooning inventory levels; and (ii) the true extent of the manufacturing problems that plagued Mohawk's LVT mills.  When the truth gradually came out in 2018 and 2019 – that sales and revenue growth at the Company were significantly down, not up, and that Mohawk's LVT production troubles were apparently unfixable – the investing public was stunned.  These revelations also caused Mohawk's share price to nosedive.

14.     Between July 27, 2018 and March 29, 2019, as set forth in Exhibit A hereto, Plaintiff purchased Mohawk common stock on the secondary market in reliance on the integrity of Mohawk's stock price.  As Mohawk gradually revealed the truth to the marketplace through a series of partial disclosures beginning in October 2018, Plaintiff lost millions of dollars.  This action seeks to recover Plaintiff's losses.

## JURISDICTION AND VENUE

15.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act, as well as Georgia state law.

16.     This Court has subject matter jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and over the state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d).  At all relevant times, Mohawk has conducted business in this District and has maintained its headquarters in this District.   In addition, many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

18.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

## THE PARTIES

### I.      Plaintiff

19.     Plaintiff Fir Tree Value Master Fund, L.P. is a private investment fund, and Cayman Islands limited partnership, managed by non-party Fir Tree Capital Management L.P.  A list of the dates on which Plaintiff purchased Mohawk common stock in the United States during the Relevant Period is attached hereto as Exhibit

A.  Plaintiff's purchases of Mohawk's common stock caused it harm.

20.     Non-party Fir Tree Capital Management L.P. ("Fir Tree") was founded in 1994 and is a New York-based private investment firm that invests worldwide in public and private companies, real estate, and sovereign debt.  Fir Tree is the investment manager on behalf of Plaintiff and at all relevant times had total investment discretion for the Plaintiff's investments.

## II.    Defendants

21.     Defendant Mohawk is an American flooring company, headquartered in Calhoun, Georgia, that manufactures floor covering products, including, *inter alia*, carpet, rugs, hardwood flooring, laminates, tile, and ceramic.  Mohawk sells its flooring products to distributors, wholesalers, and retailers, including big-box stores like Sherwin Williams and Floor & Décor.  Mohawk's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MHK."

22.     Defendant Jeffrey S. Lorberbaum is currently Mohawk's CEO and Chairman of Mohawk's Board of Directors.  He has been CEO of the Company since January 2001 and Chairman since May 2004.  Lorberbaum signed and certified the purported accuracy of Mohawk's quarterly and annual SEC filings throughout the Relevant Period.  Lorberbaum knew Mohawk was carrying out fraudulent schemes

-11-

to boost profits, sales, and margins as early as January 2017, but failed to put an end to these unlawful practices or to communicate their existence to the public.

23.    Defendant Frank H. Boykin was Mohawk's CFO from January 2005 until April 2019.  He signed and certified the purported accuracy of Mohawk's quarterly and annual SEC filings throughout the Relevant Period.  Boykin also regularly spoke to investors and securities analysts about Mohawk, and its products and financial results.  Boykin knew Mohawk was carrying out fraudulent schemes to boost profits, sales, and margins as early as January 2017, but failed to put an end to these unlawful practices or to communicate their existence to the public.

24.    Defendant Brian Carson was Mohawk's President of Flooring North America from 2011 until he was fired on November 12, 2018.  In this position he managed the Flooring North America division of Mohawk – Mohawk's largest and most profitable division.  He was described in Mohawk's public filings with the SEC as being "an 'executive employee' and a 'key employee,' as those terms are defined in O.C.G.A 13-8-51," and that he "managed the Flooring North America Business Unit of Mohawk, while also participating on Mohawk's world-wide leadership team."  Carson oversaw Mohawk's 42 manufacturing plants and 41 distribution centers in North America.  He publicly stated, including on his personal LinkedIn

profile, that while President of Flooring North America he had "Full P&L [profit and loss] ownership" over Mohawk's complete North American business.

25.    During the Relevant Period until he was fired, Carson furnished, approved, and certified each quarter the purported accuracy of the information concerning Mohawk's Flooring North America segment that was provided to investors during quarterly conference calls and incorporated into Mohawk's consolidated financial statements and SEC filings.  Consistent with the typical practice in large, publicly-traded companies, and as confirmed by Mohawk's former Vice President of Finance (Commercial and International) from July 2006 until November 2017, and member of Mohawk's Sarbanes Oxley Act ("SOX") accounting staff, Carson signed a document attesting to the purported accuracy of the financials for the Flooring North America division on a quarterly basis.[2]

26.    Carson engineered and caused the Flooring North America segment of Mohawk to (i) prematurely push out product at the end of the quarter to artificially inflate Mohawk's profits, sales, and margins; (ii) manipulate the Company's inventory levels by improperly classifying defective LVT as "inventory"; and (iii) overproduce LVT beyond levels of any actual demand in order to cut per-product

---

[2] This former employee is referred to as "FE2" in the Class Action complaint.  FE2 was part of Mohawk's SOX accounting staff during the Relevant Period.

manufacturing costs artificially.   These acts constituted fraudulent schemes. Defendant Carson supplied false and misleading information concerning these schemes to the Company for inclusion in public press releases, SEC filings, analyst conference calls, and other disclosures to investors – including Plaintiff – which such investors foreseeably relied upon in their decisions to invest in Mohawk during the Relevant Period.

## FACTUAL ALLEGATIONS

27.     The following factual allegations draw in part from the complaints filed in the Class Action, as well as the Maverick and Hound Partners Opt-Out Actions. On September 29, 2021, the Hon. Eleanor L. Ross, United States District Judge for the Northern District of Georgia, issued a 31-page opinion that sustained nearly every allegation set forth in the Class Action complaint.[3]  The Court further found that the confidential witness statements proffered in the Class Action complaint, *i.e.*, former employees 1-14 below, were based on "reliable first-hand knowledge" and that the Class Action complaint "unambiguously provide[ed] in a cognizable and

---

[3] The Court granted the defendants' motion to dismiss as to *one half* of *one* alleged misstatement.  That is, the Court held that the phrase "with their superior design and performance" (referring to Mohawk's LVT) constituted nonactionable puffery. Plaintiff's Complaint does not allege that this phrase was a misstatement.

detailed way the basis of the [former employees'] knowledge."[4]  The remarkable consistency and overall plausibility of these witnesses' statements render it appropriate for Plaintiff to rely upon those statements here, especially given that the details of the fraudulent scheme alleged herein lay almost entirely within Defendants' knowledge.

## I.    Mohawk's Business

28.    Mohawk is the world's largest manufacturer and distributor of ceramic tile and natural stone and one of the largest suppliers of carpet, rugs, laminate, sheet vinyl, LVT, and wood flooring in North America.  The Company employs over 41,600 workers worldwide and has leading market positions in Brazil, Australia, New Zealand, Russia, Europe, and the United States.

29.    From 2017-2019 the Company reported annual worldwide net sales of $9.5 billion to $10 billion.  Approximately 42 percent of these sales – which includes sales of both conventional flooring products and LVT – were attributable to Mohawk's Flooring North America business segment.  The United States is part of this segment and is Mohawk's largest market.

---

[4] *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, No. 4:20-CV-00005-ELR, 2021 US Dist. Lexis 193109, at *10 (N.D. Ga. Sept. 29, 2021) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239-40 (11th Cir. 2008); *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Intern., Inc.*, 806 F. Supp. 2d 1267, 1290 (N.D. Ga. 2011)).

30.     According to the Company's SEC filings, Mohawk distributed its products from the Company's distribution centers and predominantly on Mohawk-operated trucks, at all relevant times.

31.     Mohawk has grown tremendously in the last two decades.  In 2000, the Company predominantly sold soft floor covering, with carpets comprising approximately 95 percent of Mohawk's revenue.  In 2006, carpet still accounted for roughly 60 percent of Mohawk's business, and 88 percent of the Company's net sales were derived from North America.  By 2013, North America's share of net sales had dropped to 70 percent, and the share of net sales captured by carpet dropped to 40 percent.  Sales of ceramic, laminate, and wood comprised the remaining 60 percent.

32.     The Company's success continued into 2016.  In the first quarter of 2016, Mohawk achieved "the highest net sales for any quarter in the company's history."[5]  By year-end, the Company's annual revenues and EPS each climbed to record highs of $9 billion and $12.48 per share, respectively.  Mohawk's share price experienced a commensurate surge during this time as well, rising from $100 per

---

[5] Press Release, "Mohawk Industries Reports Record 1st Quarter Earnings" (May 5, 2016).

share at the start of 2013 to over $230 per share at the start of the Relevant Period in early 2017.

33.    At the start of the Relevant Period (April 28, 2017 until at least July 25, 2019, inclusive), Defendant Lorberbaum professed to investors and analysts on an earnings call that "Mohawk is in the best position in the Company's history" and that "2017 sales will grow similarly to last year."  Analysts and Plaintiff relied on those assurances and maintained their "Buy" positions for Mohawk's stock.

## II.    Demand for LVT Soars

34.    Luxury vinyl tile – LVT – is a type of flooring that mimics other conventional floor surfaces, such as carpet or hardwood, but purportedly provides superior longevity and is easier to maintain and install.  LVT is also cheaper than traditional flooring.  Because of its durability, LVT is sometimes referred to as a form of "resilient flooring" and is contrasted with more conventional floor surfaces which are seen as more perishable.  LVT's blend of aesthetic appeal, durability, and affordability caused demand for it to soar in the years leading up to the Relevant Period.

35.    For example, in 2006 resilient flooring captured 7.5 percent of the total U.S. flooring market and was a $1.9 billion market; sales of LVT comprised 5

percent of this market.[6]  By 2016 resilient flooring captured 14.2 percent of the total

U.S. flooring market and grew to a $3.2 billion market – with LVT comprising 59

percent of this category's sales.  Between 2006 and 2017 the share of LVT produced

overseas also grew – in 2006 nearly 80 percent of LVT was manufactured in the U.S.

and by 2017 domestic production dropped to 41 percent.  In a fourth quarter 2017

earnings call, Defendant Lorberbaum asserted that LVT "ha[d] grown faster than

anything that I've seen in my 40 years of history."[7]

36.    Realizing the trend towards LVT, Mohawk purchased the LVT

manufacturer IVC Group ("IVC") in June 2015 and thereby acquired LVT plants in

Belgium and the U.S.[8]  In an April 2016 interview, Defendant Carson touted that

Mohawk's U.S. "LVT plant . . . will be operating at full capacity by the end of 2016"

and added that "[t]his major investment to expand our U.S. LVT production will

meet increased demand for our unique products and enhance Mohawk's position as

the global leader in LVT, the world's fastest growing flooring category."  Defendant

Lorberbaum echoed this during conference calls, professing that Mohawk's U.S.

---

[6] Beth Miller, "LVT and Rigid LVT Market Report: The category is all-in with LVT, rigid and flexible – Feb 2018," *Floor Daily* (April 23, 2020).

[7] February 9, 2018 Fourth Quarter 2017 Earnings Call.

[8] Mohawk continues to sell product under the brand name "IVC."

LVT plant would "be one of the world's largest, most efficient production lines" and would enable the Company to "take some share from the Chinese [imports]."

### A.   Mohawk Fails to Gain Market Share in LVT Sales

37.    Mohawk's public statements concerning its LVT production proved hollow.  The Company's two prime competitors – Shaw Industries ("Shaw") and Armstrong Flooring ("Armstrong") – quickly rivaled Mohawk in LVT production. By 2017 Shaw had captured almost 30 percent of U.S. LVT sales, and Armstrong, whose market capitalization is dwarfed by Mohawk's, grabbed over 13 percent. Mohawk had only attained 12 percent of U.S. LVT sales by 2017.  Shaw and Armstrong's success stemmed from their decision to source cost-efficient LVT internationally, rather than domestically.

38.    In a November 4, 2016 earnings call, Defendant Lorberbaum claimed that Mohawk was "currently selling all of our LVT we are manufacturing, even as we continue to increase our production capacity" and that the Company was "constrained by our present capacity" in LVT production.  To allay concern, Lorberbaum promised that Mohawk was "invest[ing] almost $650 million in additional capacity, more efficient assets and new products" for LVT production. Analysts believed these statements.  Gabelli & Co. noted in a November 7, 2016 report that for LVT sold by Mohawk's Flooring North America segment, Mohawk

was "selling everything they produce."  Barclays wrote in a March 20, 2017 report that it expected "positive revenue and earnings revisions over the next two years as it becomes clear that [Mohawk] is successfully ramping the new capacity."

### III.   Mohawk Claims to Outperform Market Expectations in 2017

39.   Whether or not Mohawk could sustain its historic success in light of the flooring industry's growing trend towards LVT was top of mind for investors in early 2017.  On April 28, 2017 – the first day of the Relevant Period – Defendant Lorberbaum answered in the affirmative, claiming net sales for the Company in the first quarter of 2017 surpassed $2.2 billion and increased "approximately 4%" from the prior year's first quarter.  These numbers represented a "first quarter record" for the Company and were largely attributable to Mohawk's Flooring North America segment, which accounted for more than 40 percent of Mohawk's overall business.  Lorberbaum touted that Flooring North America was "outpacing" the growth of all other segments.

40.   These record results supposedly continued in every quarter of 2017.  Defendants reported that "revenues rose to an all-time high of $9.5 billion" for the full year of 2017, "a 6% increase" over the prior year, and that sales set new records every quarter.  Flooring North America continued to experience growth during 2017

as well, accounting for roughly 42 percent of the Company's overall purportedly record sales figures by 2017 year's-end.

41.    In 2017 Mohawk's financial results kept pace with, and sometimes exceeded, analysts' forecasts.  For example, the Company reported EPS of $2.72 in the first quarter of 2017 – the exact consensus EPS predicted by analysts.  During the third quarter of 2017, Mohawk recorded EPS of $3.75, beating consensus forecasts by just $0.01.  In the second and fourth quarters of 2017, Mohawk topped consensus expectations by $0.10.

42.    The Company's reported revenue during 2017 also nearly precisely matched analysts' predictions.  Mohawk's reported $2.453 billion in revenues for the second quarter of 2017 surpassed analysts' expectations by merely one-fifth of one percent (*i.e.*, $4.80 million), and during the fourth quarter of 2017, the Company supposedly achieved $2.369 billion in revenues, exceeding consensus estimates by just less than one-fifth of one percent (*i.e.*, $4.60 million).

43.    Mohawk's publicly reported financial results, which repeatedly met or exceeded consensus estimates, buoyed the Company's stock price.   Public companies well know that if they fail to meet analysts' quarterly consensus estimates their share price is very likely to drop.  Mohawk avoided any such decline in 2017

because it reported "record" financial results every quarter. Analysts even raised their target share prices for the Company following each quarterly report.[9]

44. The Company's record results in 2017 extended to its operating margins as well. For example, on April 27, 2017, Defendant Lorberbaum reported that "[o]ur operating margin for the [first] quarter rose to 12.4% . . . the highest first quarter result in the company's history." A company's operating margin effectively measures the portion of revenue that flows through to a company's net income (*i.e.*, income after all expenses have been deducted), and investors often focused on Mohawk's margin when evaluating the Company's financial performance. Margins for the second quarter of 2017 were also up "60 basis points" over the prior year.

45. Defendant Lorberbaum attributed these improvements directly to the Company's Flooring North America business segment, and specifically Mohawk's LVT production, stating on April 28, 2017 that "[t]he continued improvement of our LVT manufacturing process is increasing our capacity and margins" and that "it would be hard to drive the margins up dramatically . . . and leave out such a large part of our business [referring to LVT production]."

---

[9] SunTrust Robinson Humphrey raised its target price for Mohawk from $248 to $260. *See* SunTrust Robinson Humphrey, "Results Summary and 2Q17 Guidance," (April 28, 2017). J.P. Morgan Chase & Co. raised its target price for Mohawk from $242 to $250. *See* J.P. Morgan Chase & Co., Analyst Report (July 28, 2017).

46.     Analysts took note.  Credit Suisse stated during an investor call on July 28, 2017 that "Flooring North America margins have really improved nicely as we've moved through the year."  J.P. Morgan Chase noted that for Flooring North America, Mohawk "continue[d] to do fantastic there in terms of year-over-year margin improvement with the fourth quarter again up strongly year-over-year and a lot of that driven by productivity."  And Wells Fargo similarly reported on July 27, 2017 that "[i]t's really the margin performance that piques our interest," and specifically identifying the "solid incremental operating margins in" Flooring North America, which were up 24 percent relative to 2016.

## IV.   Defendants Claim Mohawk's Unparalleled Success in 2017 Resulted From Legitimate Business Practices and the Quality of Its LVT

47.     Throughout the Relevant Period the Defendants repeatedly emphasized that Mohawk's unprecedented sales figures resulted from legitimate business practices and the quality of its LVT.  For example, Defendant Lorberbaum credited the Company's 2017 results to its "unique strategy that combined the best features of a large, well-run public company, a private acquisition firm and a venture capital group."  He also stressed that the Company's "flexible, rigid and commercial LVT collections are being well accepted across all channels" because of their "superior design and performance," and that "LVT and laminate sales outpaced other hard surfaces . . . as a result of our leading design and performance attributes."  The

Company's purported high-quality LVT led to Flooring North America's reported record sales.  Specifically, Defendants reported in every 2017 quarterly report filed with the SEC that "higher sales volume" of LVT and "the favorable net impact of [LVT] price and product mix" drove Flooring North America's unparalleled sales figures.

48.    Mohawk's remarkable and unprecedented financial results prompted skepticism from analysts about its sustainability.  To quell concern, the Company claimed that its production facilities were churning out – and selling – as much product as possible, and that expansions in capacity were forthcoming.  For example, during an April 28, 2017 investor call, Defendant Lorberbaum said that "[m]any of our production facilities are running at or near capacity" and, during a call with analysts and investors in the third quarter of 2017, Defendants again stated that "capacity limitations in laminate, LVT and some residential carpet categories constrained our sales."   In that same third quarter call, Defendant Lorberbaum asserted that production capacity was growing, stating "we've made changes in the manufacturing and increased the capacity of LVT" in the U.S.  And in an October 27, 2017 press release, Defendant Lorberbaum maintained that "[i]n the fourth quarter . . . we expect higher sales with the relief of some of our capacity constraints, enabling us to expand our market position."

49.     Defendants' repeated and specific public assurances about the then-current state of Mohawk's business, and in particular the Company's LVT production, worked.  Analysts continued to recommend Mohawk stock as a "top pick"[10] and during 2017 Mohawk's stock price surged 37 percent, to close at a value of $275.90 per share at the year's-end (up from $201.75 at the year's start).

## V.     Defendants Obscure Troubling Trends in Inventory and Turnover Time with Anodyne Explanations

50.     Despite Mohawk's alleged extraordinary success in 2017, during this time the Company's inventory and turnover time were increasing at an alarming level during the Relevant Period.  For example, Mohawk's inventories ballooned from $1.74 billion on April 1, 2017 to $2.37 billion on June 29, 2019.  The Company's days in inventory rose from 110 days at the start of the Relevant Period to 128 days just before the Relevant Period's end.

51.     Defendants proffered generic explanations for these trends, claiming that "raw material inflation," "geographic expansion," and "product growth" were to blame.  As the rise in inventory and turnover time prolonged, analysts began to ask more pointed questions about this issue.  For example, during Mohawk's October 26, 2018 earnings call, an Evercore ISI analyst asked about the Company's

---

[10] Evercore ISI called Mohawk a "top pick due to its best-in class track record." Evercore ISI, Analyst Report (November 9, 2017).

surplus LVT: "[W]ithin inventory specifically, I was hoping that you could help us understand or break down what we see in the overall inventory number because it still seems kind of high. In other words . . . was there a buildup of LVT ahead of some launches?"  Defendants responded on script, again blaming raw material inflation and claiming the trend would pass; as Defendants Lorberbaum and Boykin stated: "[T]he inventory turns get worse because the raw materials have increased, and it's showing up in the inventory dollars"; and "The inventories are expected to go down in the fourth quarter.  And we would expect to continue to see improvement in our inventory turns as we move to the next year."

52.    Defendants' promises never came to pass.  Mohawk's inventories rose again in the fourth quarter of 2018 – the eighth straight quarter in which inventories had increased.  By this time, inventories reached $2.288 billion and were 31 percent higher than reported in the first quarter of 2017.  As previously noted, days in inventory were up at this time as well, and reached 128 days; a 20 percent increase since the first quarter of 2017.  Defendants again chalked these increases up to "higher raw material costs" and a "ramp up of new plants, acquisitions."  Throughout

the Relevant Period analysts accepted Defendants' assurances that growing inventory and turnover time was a minor problem that would soon let up.[11]

## VI.    Mohawk's Fraudulent Schemes

53.    Unbeknownst to investors, during the Relevant Period Defendants were meeting analysts' financial forecasts for the Company and boosting Mohawk's share price, not through legitimate business practices, but through numerous massive frauds.

54.    The first fraud – the "Saturday Scam" – was a classic example of channel stuffing.  At the end of almost every financial quarter during the Relevant Period, Defendants would load their trucks with all items ordered by customers at any time.  Once the items were loaded, and before any were delivered, Defendants would generate an invoice to its customers and recognize a "sale" in the current quarter.  To avoid customers possibly rejecting these premature deliveries and forcing the Company to record a return in that quarter, every item loaded on a truck was purposefully scheduled for delivery on Saturday (*i.e.*, the last Saturday before

---

[11] Evercore ISI repeated Mohawk's claim that "inventory issues" were "temporary" and reiterated an "outperform" rating for Mohawk's stock.  *See* Evercore ISI, Analyst Report (April 30, 2017).  SunTrust Robinson Humphrey stated that Mohawk's production was now expected to "equal sales" and that the Company's inventory correction "should stop drag."  *See* SunTrust Robinson Humphrey, Analyst Report (May 14, 2019).

the quarter's end), a date on which the vast majority of customers' receiving platforms are closed and are not available to accept or reject deliveries.

55.     When the Saturday Scam began – likely no later than February 2017 and certainly no later than April 2017 – Defendants would actually load trucks with product and attempt to make deliveries.  But because these shipments were made on Saturday, over 90 percent of the loaded product was not delivered.  As the scheme repeated itself quarter-after-quarter and workers grew tired of pointlessly loading product they knew could not be delivered, employees would just walk around Mohawk's distribution centers on the last Friday of the quarter and scan product for delivery, thereby recognizing a "sale."  Days later, once the new quarter had started, Mohawk employees would again walk around Mohawk's warehouses and simply re-scan product as "returned."

56.     The Saturday Scam is one of the true reasons Defendants continually set so-called "record" sales and allegedly matched or exceeded analysts' financial forecasts during the Relevant Period.  The scheme was committed in every quarter of the Relevant Period, except the second and third quarters of 2018, and was carried out by Mohawk senior executives.  It involved millions of pounds of product, customers of every size, and occurred at every Mohawk distribution center in the country.  One former Mohawk employee called this scheme "the biggest sham ever."

57.    Mohawk did not carry out the Saturday Scam in the second and third quarters of 2018 because, as a former employee explained, Mohawk senior executives informed workers that the Company (at those times) was so far away from making its numbers that "there was no point."[12]

58.    Mohawk's Saturday Scam also directly defied the Company's stated sales revenue-recognition policies and GAAP.   Under GAAP, specifically Accounting Standards Codification 605 (*see* ASC 605-10-25-99) and Accounting Standards Codification 606 (*see* ASC 606), as well as the SEC's Codification of Staff Accounting Bulletins, Topic 13, revenue may only be recognized when, among other things, persuasive evidence of an "arrangement" exists and "delivery has occurred."  In its annual report for 2017 filed with the SEC on Form 10-K, Mohawk explained that sales revenue is recognized when "delivery has occurred."[13]  Mohawk reiterated its purported adherence to this rule in its 2018 first quarter report filed with the SEC on Form 10-Q, and every quarterly and annual report filed thereafter during

---

[12] The former employee is identified as "FE8" below, and was the Senior Manager of Distribution Operations at Mohawk from May 2017 to September 2019.

[13] "Revenues, which are recorded net of taxes collected from customers, are recognized when there is persuasive evidence of an arrangement, ***delivery has occurred***, the price has been fixed or is determinable, and collectability can be reasonably assured."  Mohawk Industries, Inc., Annual Report (Form 10-K) (Feb. 28, 2018).

the Relevant Period.[14, 15]

59.     Defendants carried out numerous other frauds to artificially increase the Company's financial figures, and thereby boost Mohawk's share value. **_First_**, at the direction of Defendant Carson, Mohawk's factories manufactured surplus product during the Relevant Period, despite a lack of any excess sales demand.  This mass overproduction had the effect of cutting per-unit manufacturing costs and thereby artificially inflating Mohawk's profits and margins.  It also caused the Company's inventory levels to balloon, and far outstrip any actual demand, a fact that analysts honed in on in the latter part of the Relevant Period.  Mohawk was so flooded with unneeded product during this time that the Company initially rented 109 trailers to store it all.  Eventually the trailers were insufficient to house Mohawk's excess

---

[14] "The Company recognizes revenues when it satisfies performance obligations **_as evidenced by the transfer of control of promised goods to customers_**, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods . . . ."  Mohawk Industries, Inc., Quarterly Report (Form 10-Q) (May 4, 2018).

[15] Mohawk's performance of the Saturday Scam also violated the Company's publicly stated policies on "ethics" and "corporate conduct."  For example, the Company's published "Standards of Conduct and Ethics for Employees, Officers, and Directors of Mohawk Industries, Inc." assured investors that Mohawk's officers would "not authorize or permit the use of . . . an accounting treatment if the effect is to distort or conceal Mohawk's true financial condition."  The Company also represented that its executives would not "distort or conceal Mohawk's true financial condition," even if a "particular accounting treatment for one or more of Mohawk's operations may be permitted under applicable accounting standards."

inventory, so the Company rented two giant warehouses – one with 100,000 square feet of storage space and the other with 200,000 square feet – to stow the surplus product.

60.    *Second*, Mohawk perpetrated a scheme to conceal its LVT production problems.  During the Relevant Period, Mohawk was mass producing unsalable scrap LVT.  Defendants knew public disclosure of these issues would negatively impact Mohawk's share value and so were adamant about hiding these facts.  To conceal these problems, Defendants chose *not* to take a write-down on the defective LVT – as required by GAAP – but instead deliberately decided to classify the scrap LVT as "inventory."

61.    As former employees explained, Defendants would book the junk LVT as inventory and put "a code" on it to signal that it should not be shipped out.  This had the effect of both hiding from investors the Company's pervasive LVT quality-control problems and inflating Mohawk's margins and profits (as the scrap LVT was not factored into the Company's cost of sales).

62.    *Lastly*, the Company was selling massive amounts of junk LVT and labeling it as "first quality," despite its attempts to prevent such product from being shipped out.  Mohawk then carried out a massive claim denial strategy to reject

customers' legitimate product returns.  These schemes further (falsely) boosted Mohawk's profits, sales, and margins.

63.     As confirmed by former employees, during the Relevant Period retailers were returning 25 to 50 percent of Mohawk's LVT because it was defective or altogether junk, and many eventually stopped carrying the Company's products altogether.  Mohawk's distributors were also returning "truckloads" of Mohawk's LVT.  As one former employee stated: "Everybody got bad material across the country," and "Everyone who took product [was] complaining about it."  These problems tarnished Mohawk's reputation and consequently reduced the salability of other Mohawk products.

64.     Then, as early as 2017, when customers predictably attempted to return Mohawk's defective LVT, the Company carried out a massive scheme to deny these legitimate return claims.  According to former employees, Company executives instructed Mohawk workers to categorically deny all return claims.  "[T]hey'd deny, deny, deny until someone gets a lawyer involved," a former employee explained, "[t]he claims people were told to deny everything."  Mohawk's scams of selling junk product that it labeled "first quality" and then declining legitimate return claims predictably destroyed its relationships with key customers.  For example, between

2017 and 2019, some of the largest home building companies in the U.S. severed ties with Mohawk.

65.     The fraudulent schemes detailed above, which are corroborated by 20 former employees ("FEs") described in the Class Action and Maverick Opt-Out complaints and whose accounts are detailed below, are the true reasons Mohawk was reporting "record" financial figures during the Relevant Period.[16]  On July 13, 2020, Mohawk filed a Form 8-K with the SEC disclosing that the Company was under investigation, by both the United States Department of Justice and the SEC, concerning the Defendants' fraudulent schemes detailed herein.

### A.     The Saturday Scam

66.     FE3 was a Distribution Center Manager at Mohawk's West Hampton, New Jersey facility from February 2017 to July 2019, and was responsible for day-

---

[16] The allegations in the Class Action complaint are based on the accounts of 14 former employees, which are identified in that complaint as "FEs" 1-14.  The allegations in the Maverick Opt-Out complaint are based on the accounts of 12 former employees, which are identified in that complaint as "CWs" 1-12.  Many of these witnesses are also cited in the complaint filed in the Hound Partners Opt-Out Action.  Upon information and belief, FEs 6-9 and 13 in the Class Action complaint are CWs 11, 6, 9, 12, and 2 in the Maverick Opt-Out complaint.  FEs 1-14 below correspond to FEs 1-14 in the Class Action complaint.  FEs 15-20 below correspond to the CWs in the Maverick Opt-Out complaint as follows:  FE15 is CW1; FE16 is CW3; FE17 is CW4; FE18 is CW7; FE19 is CW8; FE20 is CW5.

to-day operations at the facility.[17]  FE3 worked under Mohawk's Vice President of Delivery Operations, Matthew Witte ("Witte"), who in turn worked directly under the Company's Vice President of Logistics, Dan Flowers ("Flowers").  Flowers reported to Brian Carson, the President of Flooring North America.

67.    FE3 stated that as early as February 2017, both Witte and Flowers would direct the managers at Mohawk's distribution centers around the country to load as much product as possible onto Company trucks and schedule it for delivery on the last Saturday of the quarter.  The stated purpose of this directive, according to Witte and Flowers as reported by FE3, was so that the Company could recognize the sales in the quarter and meet revenue targets.  FE3 explained that Witte and Flowers communicated these directives to every Mohawk distribution center during national conference calls and in emails: "[W]e were all told to do it, throughout the whole country. . . .  We're down on our quarter numbers and we have to make them. We were told we had to make sure it got out.  We'd have twenty stops on a truck for Saturday deliveries and we made maybe one of them, or none.  That was the norm. No one took deliveries on a Saturday.  This was the directive to all of us from

---

[17] FE3 was responsible for delivery of all products to customers in Western Pennsylvania, Philadelphia, and Central and South New Jersey.  The West Hampton distribution center received order shipments from the central distribution facilities in Georgia and would then make the actual deliveries to customers.  FE3 reported to the Regional Operations Manager, FE4, who in turn reported to Witte.

[Witte]." FE3 stated that following each quarter's-end Flowers would send an email to all distribution center managers, thanking them for their involvement in the scam.

68.     According to FE3, on the last days of almost every quarter the Company's distribution centers would receive excess product that was produced by Mohawk's mills. The mills produced surplus product, according to FE3, "just so [Mohawk] could juice their numbers." As FE3 explained, "They would boost their production numbers and sales and we were left with all of these fake deliveries."

69.     The burdens of the scheme were felt directly by FE3 and his staff; as he recounted "[t]he week after the end of a quarter would bury us in returns for all these fake deliveries." FE3 pleaded with Witte and Flowers to stop the scam: "I told them that I don't even load my stuff out. We just scan it without moving anything because there was no point. Nothing ever got delivered anyways. It was all fake." Nonetheless, FE3's pleas were rebuffed. This is why the Saturday Scam became more and more brazen, and culminated in distribution center employees never even loading product onto trucks or attempting to deliver it at all. Instead, according to FE3, employees simply walked around the distribution centers and scanned product before the quarter's-end, thereby generating "sales," and then just days into the new quarter scanned the same products as "returned." FE3 explained that "[d]epending

on the customer, the same order could get scanned out multiple times in these fake deliveries."  Affected customers included Sherwin Williams and Floor & Décor.

70.     FE3's distribution center invoiced sixty to eighty orders on the last Saturday of each quarter.  He explained that all of the Company's U.S. distribution centers engaged in the scam – "Every route had it.  It was always mandatory" – and that all the products in his geographic area (*i.e.*, vinyl, LVT, ceramics, wood, and carpet) were included in the fake deliveries.  FE3 said he felt coerced to carry out the Saturday Scam because Flowers would send threatening emails and also warn that "'[w]e're not making our numbers this quarter.'"  FE3 feared he might lose his job if he did not follow Flowers' commands.

71.     FE4, a Regional Operations Manager at Mohawk for the Northeast and mid-Atlantic regions from 2016 until July 2019 and Mohawk employee for over 20 years, corroborated FE3's account.[18]  FE3 reported directly to FE4, who in turn reported to Witte.  FE4 confirmed that Witte and Flowers would tell Mohawk's employees on conference calls and in emails that they had to carry out the scam so the Company could meet its financial targets: "It was about meeting financial

---

[18] FE4 was responsible for all transportation and logistics in the Northeast and Mid-Atlantic regions and managed approximately 125 employees spread across five warehouses in Massachusetts, Maryland, New Jersey, and Pennsylvania.

expectations at the end of the quarter for shareholders.  There was no other reason to do it and no one was shy about saying it.  That's what we were all told."  FE4 attended conference calls in 2017, 2018, and 2019 at which this was stated, and saw emails in the same years in which Flowers communicated the goal of the scheme. FE4 reported that the scheme occurred across the country and that all Mohawk's customers were affected by it: "There could be a hundred customers or more [each time].  It was everything.  It didn't matter the size of the company.  It was just whatever product we had in the shop.  We always delivered to the same accounts. These are long standing relationships.  These were customers ordering from us on a regular basis.  It didn't matter.  We did this to everyone."

72.    FE4 stated that at the "quarter end, the directive was to deliver on Saturdays, which we [otherwise] never do.  Ninety percent of the stores are closed. So, we'd load trucks up, then bring [the product] right back.  They'd add all of that money to the financials at the quarter end to boost them up."  He further explained that the premature Saturday delivery attempts were often to the same customers again and again, even though Mohawk employees knew such customers would not accept the deliveries because of their rejections in prior quarters.  "[F]our to five million pounds of product" was loaded for "delivery" at the end of almost every quarter, FE4 recounted, "We would tally purported routes, stops, and weight on

spreadsheets and would discuss them in calls and emails.  All that stuff would get invoiced overnight on the Fridays."

73.    FE4 explained that "[t]here was a lot of push back from people at first, but eventually everybody stopped questioning it" because "[w]e were afraid for our jobs."  FE4 also raised concerns about the scam with his boss at the time, Joe Zasaitis, Senior Director of Operations at Mohawk from 1987 until 2017, but was rebuffed: "We all realized what this was.  This is fixing the numbers.  Everyone knew that ninety percent of [the end-of-quarter delivery attempts] were going to be coming back.  It was just pushing bigger numbers up at the end of quarters."

74.    FE5, who oversaw sales from Mohawk's U.S. LVT plant to the Company's East Coast and Canadian distributors from January 2016 to February 2019, further corroborated FE3 and FE4's accounts.[19]  FE5 explained that at the end of almost every quarter Mohawk employees would fill trucks full of product not yet wanted by distributors, pull these trucks into an empty Mohawk parking lot, and then recognize sales for these products on the Company's books.  He recounted that major

---

[19] FE5 had been a Division Manager at IVC, a U.S.-based LVT manufacturer, since November 2015, until Mohawk acquired the company in January 2016.  FE5 reported to the Director of Distribution Sales at Mohawk's IVC, Jim Chepalis; Chepalis reported to the Senior Vice President of Distribution at Mohawk, Paul Murfin.

Mohawk distributor customers who were prematurely invoiced – including Apollo Distributing Company in New Jersey; New England Floor Supply in Connecticut; and JJ Haines & Company in Maryland – routinely voiced complaints.

75.      FE6, a Logistics Business Analyst at Mohawk who conducted analyses and drafted reports on logistics and shipping costs from January 2019 to April 2020, confirmed the details of the Saturday Scam, and that the scheme was "heavily enforced" by senior management.[20]  He also recounted that up to four to five million pounds of product were loaded for the fake Saturday deliveries.  FE6 corroborated FE5's account that the same customers were repeatedly sent products for premature delivery on Saturday, and explained that the express purpose of the scheme was to artificially inflate sales and revenue figures; stating the reason for the scam was "to show our sales numbers were higher or better than they really were because we knew our sales were down" and that the reason the scheme took place at quarter's-end was, as FE6 was told by Witte, "so we could bill them and so we can report the sales on those orders whether they were delivered or not."

---

[20] FE6 reported to a Senior Delivery Operations Manager at Mohawk, Chris Senjem, who in turn reported to Witte.  FE6 was responsible for performing analyses and drafting reports concerning Mohawk's logistics and shipping costs.

76.     FE7, a Distribution and Plant Manager from April 2014 until November 2019 who oversaw Mohawk's Dalton, Georgia distribution centers, which distributed all of Mohawk's vinyl sheet and LVT products nationwide, corroborated the accounts of other FEs concerning the Saturday Scam.[21]   FE7 reported to Mohawk's Director of Operations, Distribution, and Logistics, Jeremy Tatum ("Tatum"), who in turn reported to Flowers.   FE7 said that Flowers directed analysts to find orders in Mohawk's systems to prematurely "ship" to customers on the Saturday before quarter's-end, and that Flowers and Tatum directed every distribution center manager across the country to ship "every order in the system" on this day, despite the agreed-upon shipment dates being many months away.

77.     According to FE7, Tatum and Flowers were explicit in conference calls and emails that the Saturday Scam was being performed to "make [Mohawk's] numbers at the end of the quarter."   Flowers even had his own phrase to describe the scheme – he instructed all the distribution managers to "drain the swamp" for every possible order at the end of the quarter.   FE7 confirmed that millions of pounds of product were loaded for "delivery" on the last Saturday of almost every quarter during the Relevant Period, and that customers like Sherwin Williams were

---

[21] FE7 was responsible for managing Mohawk's IVC facilities in Dalton, Georgia, where the Company manufactured its LVT products.   He oversaw approximately 100 employees.

subjected to this practice over a half dozen times between April 2017 and July 2019. Sherwin Williams rejected the premature deliveries of between 80,000 and 160,000 pounds of product each time.

78.    FE20, the Chief Information Officer for Mohawk from April 2014 until August 2017, recalled that throughout his entire tenure at Mohawk, the Company would ship products to customers months early at the end of the quarter in order to "meet" financial projections.[22]  For example, as FE20 recounted, to meet end-of-year sales goals, Mohawk would ship product at the end of December even though it was not scheduled for shipment until February of the following year.  According to FE20, once the product had left the factory Mohawk would recognize it as a sale. As FE20 stated, "[i]t was a very common practice to ship out everything they could . . . .  You could call it channel stuffing.  That's exactly what they did for years.  It was standard operating procedure."  Some customers, FE20 explained, would just let the shipping containers full of prematurely shipped product sit in their parking lots to avoid the expense of sending it back.

---

[22] FE20 worked at the Company's Georgia headquarters and reported to Brian Carson.  FE20 oversaw Mohawk's information technology and information systems department.

79.    FE20 explained that the Saturday Scam was obvious to Company insiders – including Brian Carson – and that insiders knew Mohawk was doing it to manipulate earnings and recognize revenue prematurely.   FE20 reported that Defendant Carson was present at staff meetings at which the plans to prematurely ship product were discussed.   At these meetings, FE20 stated, it "was standard procedure" for attendees to ask: "What orders can we pull in to hit our forecast?"

80.    FE15, Vice President of National Accounts and Vice President of E-Commerce at Mohawk from March 2014 until October 2019, also confirmed the Saturday Scam.[23]   FE15 was part of a team called the "G3 Team" that met weekly in order to determine why the Company's LVT sales were down.   According to FE15, a quality engineer on the G3 Team told FE15 that Mohawk deliberately shipped defective LVT that the Company knew would be returned just so Mohawk could generate an invoice for the "sale" and "get their billing numbers up."   FE15 recounted that this was not surprising because FE15 had worked at Mohawk long enough to know the Company had a pattern of "shady behavior."   Revenue was improperly recognized under GAAP in connection with the Saturday Scam both because Mohawk had no arrangement with the customers to purchase product it had

[23] FE15 was employed at Mohawk from 2006 until 2020, ending his tenure there as Vice President of National Sales.

not yet ordered (or intended to order at a later time) and because Mohawk usually failed to successfully deliver the goods to the purported buyer.

81.    FE8, the Senior Manager of Distribution Operations at Mohawk from May 2017 to September 2019, also confirmed the details of the Saturday Scam. According to FE8, the scheme was performed throughout the duration of the Relevant Period, but was suspended in the second and third quarters of 2018.  FE8 explained that Witte and Flowers halted the scheme during these two quarters because Mohawk was so far behind on its financial targets.  As FE8 stated: "[W]e knew we were going to miss our numbers, so there was no point."

### 1.    Mohawk's Top Executives Carried Out the Saturday Scam

82.    The Company's executive leadership was intimately involved in the Saturday Scam.  As detailed *supra*, at the end of almost every quarter of the Relevant Period, Flowers, Witte, Tatum, Carson, and Gary Lanser ("Lanser"), Chief Operating Officer of Flooring North America, among others, would direct every distribution center manager in the U.S., through conference calls and emails, to execute the scheme.  Further, as recounted by numerous former employees, Mohawk's executive leadership not only issued directives to effectuate the Saturday Scam, they also received reports describing the results of the scheme and confirming its success.

-43-

83.     For example, FE9, a former Operations Analyst who worked in Mohawk's Finance Information Technology department and performed a majority of the sales reporting at Mohawk's headquarters from June 2017 to March 2020, reported that Defendants Lorberbaum and Carson received through email, and in PDF and Excel formats, sales reports which showed the sharp rise in orders that were invoiced on the final days of the quarter and that the Company recognized revenue when the products were simply shipped, but not delivered.[24]  FE9 was tasked with verifying the data in these sales reports before they were sent to Defendant Lorberbaum and others in top leadership positions within the Company.  These so-called "master reports" contained figures from all divisions and showed the intended end-of-quarter spikes in sales that resulted from the Saturday Scam.

84.     FE9 recounted that senior leadership in each division also received daily reports through email, which set forth daily sales – which were counted when an order was shipped (even if not delivered) – as well as any variance in daily, month-to-date, quarter-to-date, and year-over-year sales.  These daily reports also showed a marked rise in sales on the last day of a quarter across the majority of

---

[24] FE9 worked in a variety of roles at Mohawk from March 2014 until March 2020. From June 2017 to June 2018 he worked at Mohawk's IVC and reported to Amanda Clear Haynes, who in turn reported to Paul Murfin.  From March 2018 to March 2020 he worked at Finance Information Technology in the Company's headquarters, and reported to Nathan Forrester, who in turn reported to Yatkwai Kee.

product lines.  FE9 stated that Carson received the daily reports.  Both the daily and master reports were generated by a program called "Webby," which was a data warehouse that allowed the Company to track historical information on daily sales over a span of years.

85.     FE9 received the daily divisional reports as early as June 2017 (when he was assigned to IVC), was tasked with overseeing the reports in 2018, and recalls managers referring to the reports as far back as 2015.  Shortly after he transferred into his corporate position, FE9 questioned his then-boss, Business Process Specialist, Nathan Forrester ("Forrester"), about the end-of-quarter sales upticks and whether or not he should keep or adjust the figures.  Forrester told FE9 that the Company did not want the figures adjusted because it was trying to recognize sales at the end of the quarter.

86.     FE10, a Director of Claims and Customer Care for Mohawk's Pergo laminate business, noted that Defendant Lorberbaum also received "executive dashboard packets" that contained critical business data concerning orders, claims, and returns, for each division.[25]  FE10 stated that he knew corporate executives were

---

[25] FE10 worked for Mohawk from 2013 until August 2018 and was a Director of Claims and Customer Care for the Pergo flooring business.  He was appointed briefly as the Director of Customer Excellence for the laminate and LVT facilities.  He reported to Amanda Clear Haynes, who in turn reported to Carson.

particularly attuned to these reports because they would ask about irregularities "like returns being really high."  FE10 reported that the quarter-end sales increases and the attendant returns in the following quarter would have been set forth in the executive dashboard packets.  According to F10, the executive dashboard packets were created by the financial group and delivered to the corporate executive suite at 10:00 or 11:00 a.m. every day leading up to, and throughout, his tenure.

87.    FE6 also recounted further reports that he made that were sent out to top Company executives on the last Saturday of the quarter and which were specifically tailored to describing the results of the Saturday Scam.  FE6 explained that on the last Saturday of the quarter throughout his tenure he would manually compile statistics about the specific number of orders "shipped" prematurely to customers, the total weight being shipped, and the amount of orders marked for reshipment because the delivery was (as intended) unsuccessful.  FE6 would then input all of this data into the reports.

88.    FE6 sent these reports as PDF files through email to members of Mohawk's senior leadership, including Witte, Flowers, David Toney (the Company's then Senior Vice President of Supply Chain for Flooring North America), and the President of Flooring North America (which was Carson until his firing on November 12, 2018; Paul De Cock took up the position thereafter).

89.    Mohawk's senior executives were monitoring the Saturday Scam so closely that FE6's boss, Chris Senjem, Senior Delivery Operations Manager for Mohawk, ordered him to send reports out to senior executives *twice* on the last Saturday of the quarter – once at noon and another time at day's end.  FE6 recalled that Witte and De Cock sometimes replied to his emails, attaching the reports, and stating: "We got five million pounds out on Saturday, that was going to help us hit our numbers."   FE6 recounted that the invoices generated for the unsuccessful Saturday "deliveries" were held open and the revenue from the invoice was counted in the closed quarter, even though the product was not delivered and had to be re-shipped at the later, correct shipment date.  According to FE6, Witte repeated that the purpose of the Saturday Scam was to boost sales: "I was told it was so we could bill [customers] and so [Mohawk] [could] report the sales on those orders whether they were delivered or not."

90.    FE6 recounted that the practice of compiling data and generating reports on the last Saturday of the quarter preceded him.  According to FE6, before he joined Mohawk two of his former colleagues had compiled and disseminated these reports to executive leadership.  FE6 explained that the information contained in the Saturday reports was stored in and derived from a platform called "RoadNet,"

which ran on an Oracle server and was connected into a PowerBI program and kept on AS400, a system that was accessible to everyone in the Company.

### B. Mohawk's Other Fraudulent Schemes

#### 1. Mohawk Overproduces Product to Cut Per-Unit Manufacturing Costs and Thereby Artificially Inflate Profits and Margins

91.    As noted above, throughout the Relevant Period, Defendant Carson ordered Mohawk's manufacturing plants to elevate production beyond any real level of demand experienced by the Company.  Carson did this to reduce per-product manufacturing costs and thereby artificially boost the Company's profits and margins.

92.    FE1 was the Senior Vice President of Sales for the Builder and Multifamily division at Mohawk from February 2013 until October 2019.  He was head of the division in this capacity, and was responsible for sales to all large-scale builders across North America, which accounted for approximately 20 percent ($1 billion) of Flooring North America's annual revenue.  He oversaw the Builder and Multifamily division's salesforce of 125 people and was a member of Mohawk's

Executive Leadership Team ("ELT"), a group led by Defendant Carson and comprised of senior executives from sales, finance, and manufacturing.[26]

93.     FE1 explained that, starting in April 2017, Defendant Carson ordered Mohawk's production facilities to perform excessively long production "runs" – despite a lack of any actual demand for the excess product – in order to drive down the cost of production and thereby boost margins and profits in the current quarter: "[Carson would] run the plants harder despite not having sales demand for it in order to drive costs of production down."  This allowed Mohawk to, as FE1 reported, "capture all of that short-term gain and then roll the rest into inventory."  According to FE1, Mohawk's "inventory was going up the way it did" precisely because of this scheme.  FE1 reported that "[f]or LVT and carpet, they would make 400,000 yard runs even if they only needed 100,000.  Then they would just put the extra 300,000 in inventory."

94.     FE1 stated that all members of the ELT knew Defendant Carson's directives to produce excess product were improper (with the exception of Gary

---

[26] FE1 reported to the President of Residential Sales at Mohawk, Tom Lape, who retired in 2020 but remains at Mohawk as a consultant.  Lape reported to Defendant Carson, the President of Flooring North America.  FE1 was authorized to speak on behalf of Mohawk and was quoted in publicly available articles in industry publications during the Relevant Period, including *Floor Trends Magazine* and *Floor Covering Weekly*.

Lanser, Chief Operating Officer of Flooring North America, who engaged directly in the improper scheme): "We all knew they were cooking the books.  This wasn't just risky decisions.  We knew what he was doing we couldn't cover up . . . .  [B]ut it kept going on and on, the stock kept going up and up, and then it all fell apart.  We just lied about the numbers and the stock went up."

95.     FE1 recalled that, during the Relevant Period, Shaw reported operating margins (*i.e.*, net income divided by selling price) of between 6 percent and 8 percent, while Mohawk reported operating margins of between 14 percent and 16 percent.  FE1 explained: "You can't go from net operating margins of four percent . . . to sixteen percent when Shaw, a great company, is running half that.  We all knew what was happening."

96.     FE14, a Quality Specialist at one of the Company's largest warehouses, located in Dalton, Georgia, confirmed that between April 2017 and when FE14 left Mohawk in March 2018, the Company regularly ran the carpet lines for an unnecessarily long time and overproduced carpet.  FE14 was responsible for quality control of the manufacturing machines and their output and worked for Mohawk from November 2014 to March 2018.

97.     FE14 received regular reports showing how much each machine was scheduled to produce in a day or night, how much was to be produced in total, and

how many hours each machine would be required to run. FE14 recounted that employees had to work overtime for the long runs and expressed concern about the lack of space to store the surplus carpet. According to FE14, the excess carpet continued to pile up in the distribution centers because there was no space to store it and no trucks available to pick it up.

98.    FE8 confirmed that during the Relevant Period the Company was elevating production to a level not at all matched by demand in the real world. FE8 stated that even before the mass overproduction took place, Mohawk distribution centers were already flooded with surplus carpet. He recalled that there was enough old, excess inventory on the books in Mohawk's three large carpet distribution centers to fill up to six million square feet of warehouse space. According to FE8, roughly 30 percent of the carpet housed in the existing warehouses had been sitting there for longer than a year, and had developed creases and other damage, making it unsalable. FE8's distribution center – which was Mohawk's main distribution center – was moving multiple trucks worth of carpet that had sat unused for at least two years every day to another Mohawk facility named "DRD." Much of the DRD facility, FE8 recounted, was filled with carpet that had not moved in one or two years, or longer.

99.  Mohawk's LVT was also being overproduced during the Relevant Period.  FE7 was the manager of Mohawk's IVC distribution plants in Dalton, Georgia.  He oversaw 100 employees and distributed all vinyl sheeting and LVT products nationwide, across various sales organizations.  FE7 reported that the volume of stored LVT product was "insane" and that he repeatedly complained to Flowers about this and the lack of any space to store it.

100.  FE7 explained that between 2015 and when he left the Company in November 2019, the amount of inventory Mohawk possessed had ballooned from thirty-six million square feet to over ninety million square feet.  According to FE7, by 2017 there was no place to store the excess LVT, and FE7 began having weekly meetings with Flowers, Tatum, and Mohawk's VP of Distribution, Andrew Kearton, to discuss where to store it.  FE7 also had regular discussions with Tatum about where to store the excess scrap LVT while he and Tatum walked through the warehouses.  Additionally, FE7 sent LVT inventory reports to Flowers and Tatum every Monday morning.  The inventory reports consisted of a spreadsheet containing columns that listed the amount of inventory per product for the last three years.  These reports showed that Mohawk's LVT inventory grew every week.

101.  In 2017 and 2018 alone, FE7 recalled, one of the Company's large distribution centers, GHB, spent $5 million in "racking projects" in an attempt to

store the surplus LVT being produced.  FE7 explained that, in 2018, Mohawk unloaded excess product that was being stored in 109 rented trailers into warehouses the Company had rented.  The first warehouse stored 150,000 to 200,000 square feet of scrap product, and was located off 11th Avenue in Dalton, Georgia.  The second warehouse stored up to 100,000 square feet of scrap product, and was located on Goodwill Drive.

102.   FE7 said there was never a "capacity constraint" in terms of LVT and that it was therefore inaccurate for Mohawk to state in July 2017 that the Company was capacity constrained in their ability to sell LVT.  FE7 also confirmed that Defendant Lorberbaum's statement on October 26, 2017, that the Company had capacity "constraints in laminate, LVT and some of our residual carpet" was also inaccurate.  FE7 explained that Mohawk's excess inventory problem was continually exacerbated throughout 2017.

### 2.   Mohawk Produces Massive Amounts of Defective LVT and Improperly Classifies It as "Inventory"

103.   Throughout the Relevant Period, Mohawk was producing enormous amounts of unsalable, scrap LVT.  During this time the Company was also marking this defective LVT as "inventory" – in direct violation of GAAP – in order to avoid increasing the Company's cost of sales, which would have decreased Mohawk's operating margins.  Inventory only has value if it can be sold.  As a result, GAAP

requires a company to write down the value of inventory on the balance sheet once that value declines to a point below its carrying value, such as when the inventory is unsalable due to manufacturing defects or damage during storage. These write-downs reduce the assets on the company's balance sheet, are treated as an expense in the income statement, and increase the cost of goods sold. Defendants failed to take these mandatory write downs and continued carrying defective product on the balance sheet as full value inventory.

104. FE1 explained that Defendant Carson, in concert with Gary Lanser (Chief Operating Officer of Flooring North America) decided to designate defective LVT as "first quality" and keep it in inventory, but scan a code over it to signal to Mohawk employees that it should not be released to customers. FE1 reported: "They put it all in inventory which is what caused [Mohawk's inventory numbers] to swell because they wouldn't release it for sale. . . . That's why vinyl inventory jumped up the way it did. It was all off quality put in the system as first quality with a code over [the] top of it so it never shipped out." FE1's team assiduously kept an eye out for the "do not ship code," and at least one employee that reported to FE1 had specific responsibility over this task.

105. Several people in Mohawk's accounting division were aware of this practice, including Scott Taylor, Mohawk's Senior Controller, and Mike Riley,

Mohawk's Director of Finance.  According to FE1 these individuals said to him "You're not going to believe what's happening . . . what Carson is making us do."

106.   According to FE1, Carson's scheme of designating scrap LVT as inventory also contributed to the Company's reported slow inventory turns because despite being labeled as "inventory" the scrap LVT could not be released for sale.

107.   Between 2017 and the end of 2018 at least "[f]ifty percent of what [Mohawk] was making was scrap" LVT, according to FE1.  Mohawk stored the scrap LVT in rented warehouses, which FE1 physically went to.  He stated that "[w]e were renting warehouses to stick it in.  We had LVT all over."

108.   FE5 confirmed that as early as 2016, the Company was storing scrap LVT in warehouses in Dalton, Georgia near Mohawk's U.S. LVT plant.  FE5 reported that the warehouses were filled with pallets of large, sixty-four cubic foot boxes packed to the brim with defective LVT.

109.   FE11, the Senior Vice President of Product Development at Mohawk from January 2017 to March 2019, recounted that many Mohawk employees knew the Company's LVT production line was "fatally screwed up."[27]  He stated that

---

[27] FE11 was primarily responsible for product development and management within Mohawk's LVT and laminate divisions.  FE11 was the Director and Vice President of commercial hard surfaces at a flooring manufacturer for 14 years before joining Mohawk.  FE11 was authorized to speak on Mohawk's behalf and was quoted in

inherent flaws in Mohawk's domestic manufacturing process for LVT existed from the time he joined Mohawk to the time he left, even though the Company had invested a substantial amount of money in acquiring IVC, which provided the Company's U.S.-based LVT manufacturing plant.  FE1 confirmed that Mohawk's U.S. LVT manufacturing line "never ran well."

110.   FE5, a Division Manager at Mohawk who began at Mohawk's IVC in November 2015 and worked for Mohawk until February 2019 and who oversaw the East Coast and Canada sales division for Mohawk's domestic LVT products, confirmed FE11 and FE1's accounts.  He recalled that the very first LVT product produced by the U.S. LVT plant in May 2016 evidenced defects.  Mohawk received complaints from distributors as a result of these faults.

111.   These defects stemmed from the LVT-production line's flawed design. FE5 explained that the locking mechanism in the LVT pieces, which allowed the product to be applied without adhesive on the floor, came apart after installation. FE11 similarly noted that, from the time he started at Mohawk in January 2017 until the time he left in March 2019, the press on the Company's U.S. LVT plant had scores of problems, such as gauge issues that caused irregularity in the thickness of

---

publicly-available articles in industry publications during the Relevant Period, including *Floor Covering Weekly* and *Floor Trends Magazine*.

LVT produced and complications with clicking LVT pieces together evenly, which lead to height differences among LVT pieces that were snapped together.

112.   FE5 further reported that Mohawk performed audit tests at 2:00 pm each day on finished product produced at the U.S. LVT plant.   Specifically, employees would test the LVT product that was manufactured within the previous 24 hours from two or three different production runs.   They would lay out pieces of LVT in the middle of the factory floor and try to click the pieces together.   FE5 observed three or four such audits in the latter half of 2017 and recounted that 50 percent to 75 percent of the LVT product tested from the U.S. LVT plant had manufacturing defects.

113.   FE19, Mohawk's Regional Sales Manager for territory spanning New England to Michigan from 2005 until 2019, recounted that Mohawk's LVT product quality issues began as soon as the Company purchased LVT assets from IVC Group in June 2015.[28]   FE19 learned of the Company's defects from his customers and the sales representatives that reported to him.   "[LVT] was hurting our distributors' business," FE19 said.   "They were getting blamed for it."   According to FE19,

---

[28] FE19 reported to Vice President of Sales, Paul Murfin, and oversaw sales representatives who sold Mohawk's product to distributors, who in turn sold product to smaller flooring retailers.

Mohawk's LVT would peel up after installation and that its look and feel differed from the products IVC had previously made before Mohawk acquired it. "It was a nightmare for quite a while," FE19 iterated. "I don't know that they ever fixed it."

114.  FE17, an Organization Learning Specialist and Manager of Organizational Development in the Human Resources Department at Mohawk, reported that the Company had been aware of the problems at the U.S. LVT plant for some time.[29]  According to FE17, machinery was regularly malfunctioning at the U.S. LVT plant, its computer systems were constantly crashing, and production quality failed to meet expectations.  As a direct consequence of these problems, Mohawk was unable to fulfil tons of LVT orders.  Upper management pressured employees to correct these problems, which led to low morale and high turnover among employees.  F17 was tasked by his supervisors with examining these problems.

115.  FE17 reported that low-level employees complained of unsafe working conditions and were expected by management to work overtime to deal with the

---

[29]  FE17 worked in Mohawk's Human Resources Department, located at the Company's headquarters, from December 2016 until December 2018 and reported to the Director of Talent Operations, Becky Redd and Senior Vice President of Human Resources, Rod Weidemeir.  FE17 conducted trainings and evaluations of lower-level employees and was tasked with improving relations between middle-management and their direct reports.

troubles at the U.S. LVT plant.  Low-level employees were leaving the factory in large numbers as a result.  FE17 recounted visiting the Company's Belgium LVT facility, which did not experience the same production problems as Mohawk's U.S. LVT plant.  The Belgium plant's superior performance, according to FE17, was due to the culture there which treated the employees as craftsmen.  In contrast, at the Company's U.S. LVT facility, employees were treated as cheap labor, FE17 stated.

116.   FE20 further confirmed that the troubles at Mohawk's U.S. LVT plant were widely known within the Company.  FE20 was part of Mohawk's executive team and participated in monthly business review meetings at which all the Company's business units presented data and reports on their financial and business condition.  FE20 recalled that, at these meetings, reports from the U.S. LVT plant showed that it was continuing to produce more and more scrap LVT.  "There were issues with quality and there was a lot of pressure to fix it," FE20 recalled, "I know there was a lot of money thrown into the [U.S. LVT] plant, but I don't think they got the quality up to where they needed it to be."

117.   FE7 confirmed that serious manufacturing and product quality issues plagued the U.S. LVT plant, and that these problems existed in 2017 and 2018, and still persisted when he left the Company in 2019.  He also confirmed the LVT

thickness inconsistency, as reported by FE11.  F7 repeatedly voiced his concerns about the surplus scrap LVT being produced to Tatum and Flowers, to no avail.

### 3.  Mohawk Knowingly Sells Defective LVT and Denies Legitimate Return Claims

118.  As detailed above, during 2017 and through the end of 2018, roughly half of the LVT Mohawk produced was defective, and Mohawk classified this junk LVT as inventory to artificially boost profits and margins.  Additionally, despite some attempt to not ship out defective LVT, Mohawk nevertheless sold the Company's faulty LVT to its customers while representing to them that it was "first quality."  When customers tried to return the scrap LVT, the Company aggressively denied their return claims.  Mohawk carried out these scams to further artificially boost quarterly sales and profits.

119.  FE5, who oversaw the Company's East Coast and Canadian distributors, stated that retailers, and even Mohawk's own distributors, eventually stopped carrying Mohawk's LVT entirely because so much of the product was defective.  For example, FE5 recalled that beginning in 2016, Mohawk customer (and the U.S. plant's fourth largest distributor), Abraham Linc, reported that retailers were returning 25 to 50 percent of Mohawk's product because it was faulty.  These problems continued, and in or about early 2019, Abraham Linc stopped carrying Mohawk's LVT products.

120.   According to FE5, other distributors across the U.S. – including, Apollo Distributing in New Jersey, New England Floor Supply in Connecticut, JJ Haines in Maryland (the largest distributor of Mohawk's IVC product in the country), All Tile in Illinois, T&L Distributing in Texas, and Gilford Johnson out of Indiana – all experienced similar results.  Each distributor reported that 25 to 50 percent of the Mohawk LVT they received was defective.  FE5 recounted that between March and June of 2017, JJ Haines, returned 25 truckloads of faulty LVT, with each truckload carrying 24 pallets of LVT.  The pervasive defects in Mohawk's LVT, according to FE5, caused a 60 to 70 percent reduction in sales volume of LVT through Mohawk's distributors from January 2016 to February 2019.

121.   Retailers also stopped carrying Mohawk's LVT products, as described by FE5, because so much of it was defective and due to the high number of customer complaints and returns.  Because distributors and retailers were rejecting Mohawk's junk LVT at such high rates, FE5 asserted that it was not accurate for Defendant Lorberbaum to say at the start of the Relevant Period on April 28, 2017 to investors that Mohawk's LVT was being "well accepted across all channels."

122.   FE5 learned about the Company's unsalable LVT from, *inter alia*, attending regular meetings and phone calls with Mohawk's distributors.  FE5 stated that he additionally attended national conventions at which Mohawk's defective

LVT was a key topic of discussion among representatives of Mohawk's distributors. FE5 spoke with Paul Murfin, President of Mohawk-owned IVC U.S. and Mohawk Resilient and then Senior Vice President of Distribution at Mohawk, over the phone every two to three weeks about the U.S. LVT plant production issues and decline in demand for domestically produced LVT.

123.   FE12, a Regional Distribution Sales Manager who originally started at IVC in February 2013 and then worked for Mohawk selling to major LVT distributors in the U.S.'s southeastern region until February 2019, managed Mohawk's relationship with JJ Haines, one of the U.S. LVT plant's largest distributors, and confirmed that over 50 percent of the product produced at Mohawk's U.S. LVT plant and shipped to distributors was faulty, and that this led to a 60 percent drop in the volume of sales through distributors during 2017. He recalled that, by the time he left Mohawk in February 2019, JJ Haines' purchases from the Company had declined by at least 50 percent and that "[the customers] lost all confidence in the product line. [In terms of buying product from 2016 to 2018,] it went to almost nothing. It completely died. It was so bad that before I left, they were considering not producing any LVT product with the IVC brand because that brand was so tainted."

124.   FE12 saw Mohawk's defective LVT firsthand because, in 2017, he was tasked with inspecting the product at Mohawk's distribution centers and sending reports back to the Company's Calhoun office describing his observations.   FE12 recounted that he spent several days in JJ Haines' warehouses inspecting one carton of LVT per pallet sent by Mohawk, and that the defect rate in these audits was so high that entire batches of LVT had to be removed.   Every distributor was complaining; as FE12 stated: "I don't think we had any that were not [complaining]. Everyone who took product [was] complaining about it.   Everybody got bad material across the country."

125.   The unprecedented levels of bad product being sent to distributors caused the Company enormous damage.   FE12 explained that "Mohawk lost a lot of money and their distributors lost a ton of money removing bad material and rebuilding relationships with customers. . . .   I left [Mohawk] in February 2019 and that feeling was still rampant.   At that time [Mohawk's customers] were still very unhappy."

126.   FE15, Vice President of National Accounts and Vice President of E-Commerce at Mohawk from March 2014 until October 2019, reported that it was widely known within the Company that its U.S. LVT manufacturing had problems. FE15 recounted that "[w]e could not make a first quality product."  Mohawk's faulty

LVT caused significant problems with one of its key customers, Home Depot.  From 2017 to 2019, FE15 took part in quarterly business review meetings with Home Depot and reported that at these meetings Home Depot's representatives regularly voiced unhappiness with the quality of Mohawk's LVT and the Company's inability to fulfill Home Depot's LVT orders.  Mohawk's defective LVT was the "elephant in the room" at the meetings, FE15 stated.  The Company's general counsel, Chris Rosselli, and Murfin, each attended these meetings.

127.   Mohawk's senior executives knew about the Company's faulty LVT because, according to FE15, it was installed at Mohawk's corporate headquarters and its defects – namely, that it would not lay flat, but would peel up – were readily visible.

128.   FE16, Vice President of National Accounts at Mohawk from March 2018 until May 2018 and Vice President of Independent Distribution from August 2016 to 2018, confirmed that the Company's defective LVT was straining customer relations.  According to FE16, at least half of Mohawk's LVT was unsalable.  Instead of discarding the junk LVT, FE16 recounted that the Company would sell it to customers and describe it as "first quality."  Mohawk customers were predictably unhappy with the Company's faulty LVT, and Mohawk lost business from a broad cross-section of customers as a result.

129.   FE13, a sales representative for Mohawk from April 1998 to February 2018, confirmed Mohawk was knowingly selling defective LVT during the Relevant Period.  The LVT's locking mechanism was faulty, FE13 recounted, so LVT pieces would not lock together properly.  FE13 personally sold hundreds of thousands of square feet of defective LVT in 2017.  Because of the LVT's blatant defects, the Company cut its price from $2.50 per square foot to $0.99 per square foot.  FE13's supervisor knew the locking mechanism on Mohawk's LVT was faulty, but directed FE13 to describe the product to customers as first quality.  FE13 stated that representing the scrap LVT as "first quality" was "dishonest, shady dealings."

130.   FE13 reported that Defendant Lorberbaum knew, no later than 2017, that Mohawk's LVT was faulty and that the Company was selling one million square feet of LVT at the significantly discounted price of $0.99.  This was, according to FE13, an "unheard of deal."  FE13 said that Mohawk's fraudulent behavior "has Enron scandal written all over it."  FE13 quit in February 2018, after a twenty-year career with the Company.

131.   FE18, a Supply Chain Director at Mohawk from March 2019 until December 2019, confirmed FE13's reports that the Company was slashing the price at which it could sell its LVT.  FE18, who was personally involved with selling the junk LVT, explained that Mohawk was forced into "selling [its faulty LVT] for

pennies on the dollar [and] by the truckload."  FE18 stated that LVT product that

normally sold for $2.00 per square foot was being sold for $0.42 per square foot.

According to FE18, Mohawk had no choice but to sell defective LVT to small

retailers, because large retailers such as Home Depot and Lowe's would not accept

it.  The faulty LVT had to be removed from boxes labeled "Home Depot" and

"Lowe's" before it could be delivered to small retailers, which considerably

increased the costs Mohawk incurred to dispose of the product.  FE18 recounted that

during his tenure at the Company, Mohawk's U.S. LVT plant produced "buildings

and buildings" of faulty LVT.  These problems had not been resolved by the time

FE18 left Mohawk in December 2019.

132.  FE12 also corroborated that more than 50 percent of the LVT being

produced at the U.S. LVT plant was defective and unsalable.  In fact, according to

FE12, six months after the initial orders were shipped to Mohawk's distributors from

the U.S. LVT plant, "it was determined that most of what went out was defective"

and FE12 and his team "ended up having to take most of it back."  FE12 explained

that by early 2017 there was a substantial number of complaints from customers

about the defective product.  "It was a massive problem.  There were a lot of

complaints," FE12 recounted.

133.   FE12 also confirmed that Mohawk facilities were flooded with scrap LVT.  He recalled doing quarterly tours of Mohawk's U.S. LVT plant during the Relevant Period where "[i]t would be difficult to walk through" because "[t]here were pallets of bad material all over."

134.   FE1 recounted that "[e]ighty percent of the time, LVT stuff [that was] shipped [from the U.S. LVT plant] was coming back because the customer refused to take it."   FE1 explained that Mohawk's defective LVT, and the resultant distributor and customer returns, affected the demand for other Mohawk products. FE1 reported that, as a result of large customer losses between April 2017 and 2019, his division lost customers such as Lennar Homes (the second largest home building corporation in the U.S.), Pulte Homes (the third largest home building corporation in the U.S.), Dixie Buildings, Ready Builders Inc., and Impact Builders Corporation.

135.   In late 2017 or early 2018, FE1 learned of Carson's fraudulent scheme to label "off quality" LVT as first quality and immediately thereafter told his entire 125-person sales team to stop selling Mohawk's domestically manufactured LVT. FE1's division comprised roughly 20 percent ($1 billion) of Flooring North America's annual revenue, and more than half of the vinyl sold by Mohawk.  Thus, FE1's directive affected a significant portion of Mohawk's annual revenues.  FE5 confirmed FE1's account, stating that when FE1 and he were in Mohawk's U.S.-

based IVC office, FE1 iterated that Mohawk was losing too much credibility by selling Mohawk's defective, domestically manufactured LVT, and thus had to halt its sales.  FE12 also corroborated FE1's account, recalling he was told about FE1's decision from a Mohawk sales manager.

136.   Defendant Lorberbaum questioned FE1 in April 2018 about his directive to not sell Mohawk's domestically manufactured LVT.  FE1 explained to Lorberbaum that his division refused to sell it because "we don't make it any good" and "you cannot sell it in our arena because it would not work."  He also told Lorberbaum that everyone in his division agreed that shipping Mohawk's faulty domestic LVT would cause the division to lose half of its customers and that if his team sold it, Mohawk would end up paying three times the sales amount in shipping, labor, and return fees when customers returned the product.

137.   In early 2017, when returns and claims for refunds began pouring in, FE1 explained that the Company implemented a strategy of categorically denying all claims: "[T]hey'd deny, deny, deny until someone gets a lawyer involved . . . . The claims people were told to deny everything."  FE13 corroborated FE1's account, recalling an instance when the Company denied a customer's legitimate claim for six months before finally paying the claim once the customer involved an attorney.

138.   The claim denial strategy provided another method for Mohawk to artificially inflate its reported revenues.  As FE1 explained, the "domestic LVT was killing our profitability.  The claim rate was unbelievable.  And then we would hide that by pushing the return numbers down and denying the claims, [and] [i]f you carry that [claim denial strategy] on for six or eight months or longer, your revenue numbers are inflated."

## C.   Mohawk Terminates Its President of Flooring North America

139.   In September 2018, FE1 requested a meeting with Defendant Lorberbaum at which he disclosed to Lorberbaum the fraudulent schemes Carson was carrying out: "Carson is destroying your company and screwing with your finances . . . and it's going to get even worse," FE1 stated to Lorberbaum.

140.   Hours after this meeting Lorberbaum called FE1 back to his office. When FE1 arrived Carson was in Lorberbaum's office and Lorberbaum was confronting Carson about the Company's numbers.  When FE1 walked into the office, Lorberbaum said to him: "Carson is lying every time he opens his mouth." Next, FE1 recalled that Lorberbaum told him to sit and then looked at him and said: "[W]hat is wrong with this f---ing idiot [Carson]?  Every damn number he gives me is wrong, and he makes up bullsh-- every time I ask him."

141.  FE1 recounted that Lorberbaum then yelled at Carson for twenty minutes, after which Carson left.  FE1 then stood up to leave as well, but Lorberbaum told him to remain in his office.  FE1 remained in Lorberbaum's office for roughly an hour, during which time, according to FE1, "Carson [was] blowing up my phone asking me what I'm telling Jeff [Lorberbaum]."  FE1 showed Lorberbaum the texts he received from Carson, and Lorberbaum said in response, "he can't fire you.  I own this company.  Tell me what he's doing."

142.   FE1 replied to Lorberbaum that "he [Carson] is cooking the books" and "your company is broken.  The numbers are wrong."  Lorberbaum then looked at FE1, and FE1 urged Lorberbaum "to start looking in every bucket and talk to every one of the ELT [the Executive Leadership Team]."  FE1 reported that "Jeff [Lorberbaum] said he would look into it," and that within a week of their meeting, Lorberbaum initiated an internal investigation into Defendant Carson's schemes and interviewed everyone on the ELT.  The Company's CFO, Defendant Boykin, and his team, also participated in the investigation.

143.  Three or four weeks after his September 2018 meeting with Lorberbaum, FE1 recalled that Lorberbaum spoke with him again and admitted, "I just don't know how I missed it."  Lorberbaum fired Carson and Gary Lanser, Chief Operating Officer of Flooring North America, as result of the investigation.

Mohawk publicly announced Carson's departure on November 13, 2018, the day after it became effective.

144. At Lorberbaum's direction, the public press release contained the following anodyne statement: "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests." Conspicuously absent from this public announcement were any statements thanking the departing executives – a practice that was typical at Mohawk.[30] This is especially puzzling because Carson worked at Mohawk for 12 years and was the Company's President of Flooring North America during its "record sales" quarters throughout 2017.

145. More importantly, the November 13, 2018 departure statement omitted the truth that Carson engineered and implemented multiple fraudulent schemes over the course of several years which resulted in Mohawk's financial statements and other public statements being false and misleading. Carson was ultimately given a substantial severance package in exchange for his silence concerning the frauds he

---

[30] *See, e.g.*, Press Release, "Mohawk Industries Announces Executive Succession" (December 13, 2011) ("'I am grateful for the many years of leadership that Frank and Harold have contributed to the Company, and I am pleased that they will provide ongoing guidance and drive initiatives within our business,' Lorberbaum said."); Press Release, *Mohawk promotes Meadows, Lape to retire*, FLOOR COVERING WEEKLY (April 9, 2019).

and Mohawk perpetrated.  Carson received one year's compensation in an all-cash payment of $1,000,000, with the express requirement that he not publicly disclose any confidential information from his time at Mohawk and that he "cooperate with Mohawk's representatives in connection with any actual or threatened litigation and/or administrative proceeding(s) in which [he] is potentially a witness."

146.  Multiple employees confirmed that following Carson and Lanser's firing, Mohawk continued to carry out the Saturday Scam.  For example, FE6 confirmed that during his tenure from January 2019 and into 2020 – long after Carson had been fired – Mohawk continued to push out product at the end of the quarter.  He also recalled that every quarter he was there, he manually compiled reports the last Saturday of the quarter's-end and sent them to Carson's replacement, Paul De Cock, who would sometimes reply to FE6's email attaching these Saturday reports and saying  "good job" and this is "going to help us hit our numbers."

147.  FE7 also recalled that he could not remember a quarter at the end of 2018 or in 2019 – after Carson's firing – in which he and his fellow distribution managers were not instructed to "drain the swamp" to "make the numbers at the end of the quarter."

148.  Mohawk persisted with other fraudulent schemes as well following Lorberbaum's firing of Carson.  FE8 recounted that in his last six months working

on the carpet side of the business – which was after Carson was fired – Mohawk continued to manufacture surplus carpet rolls that Mohawk knew had no backorders. He also reported that during this same period, Mohawk "knew they had the raw materials and the machines, and they could prop up their balance sheet by building up inventory." FE8 said that despite the large amounts of "old, excess [carpet] inventory on the books" that "had been sitting on the books for two or three years," Mohawk "wouldn't let us write it off the books because it was propping up the balance sheet." According to FE8, Mohawk continued overproduction on the LVT side of the business after Carson was fired too. And FE7 similarly noted that the two warehouses that Mohawk rented for the express purpose of storing faulty LVT were full when he left in November 2019.

149.  Further, FE5, FE12, and FE18's accounts, as detailed in Section VI.B.3. above, confirm that Mohawk persisted in selling junk LVT to its customers after Carson's firing. Moreover, according to FE13, Lorberbaum knew Mohawk was selling defective LVT as early as 2017.

**VII.  The Truth Is Gradually Revealed & Mohawk's Stock Value Plummets**

150.  Over the course of several months – October 26, 2018 to July 26, 2019 – Mohawk revealed in piecemeal fashion that its profits, sales, and margins were significantly down, not up, and that Mohawk's LVT production troubles were

apparently unfixable.  As Mohawk gradually revealed the truth to the marketplace through a series of partial disclosures, Plaintiff suffered millions of dollars in losses.

### A.    Investors are Shocked When Mohawk Reveals Poor Earnings in Q3 2018

151.    On October 26, 2018, Defendants disclosed disappointing earnings. Lorberbaum stated on the quarter's conference call that "[s]ales growth in all segments was lower than our estimates" and that "[a]dditional manufacturing reductions were required during the [quarter] to control inventory."  He also disclosed that the problems at the U.S. LVT plant persisted, and included "physical mechanical failures" and "software problems."  Flooring North America's margins were also down significantly, with operating margin having fallen to single digits. Defendants attributed these declines to "lower than expected production."  As a result, Defendants had to lower EPS guidance for the fourth quarter, forecasting $2.45 to $2.60, a stark drop from analysts' consensus EPS expectation of $3.51.

152.    Analysts and investors were shocked by Mohawk's disclosures.  Pacific Square Research explained in a report titled "*Floored! Coverage Closed*," that "[t]here is no getting around that Q3 was a disaster for Mohawk" and that they were "completely blindsided" by Mohawk's poor sales.  "[W]hat happens if they can't sell all of that inventory?" the report asked.  Wells Fargo's analysts similarly iterated

in their October 26, 2018 report that Mohawk's reported results were "truly surprising" and that "[w]e have grown increasingly wary of the [Mohawk] story[.]"

153.   Hours after these revelations, Mohawk's stock price plummeted, losing another $36.04 per share in value – a 24 percent drop.  This stock-drop erased $2.6 billion more in shareholder value.  9.6 million shares of Mohawk stock traded hands on October 26, 2018, a 440 percent increase in trading volume from the prior trading day.

154.   Defendants' damning revelations on October 26, 2018 concerning the company's manufacturing problems and lagging sales and inventory were again half-truths because they did not fully reveal that the cause of the Company's disappointing financial figures was Defendants' decision to temporarily halt the Saturday Scam.  Nor did these disclosures come clean about Mohawk's substantial LVT manufacturing problems, the large amounts of defective LVT it was producing, or the Company's warehouses which were filled with surplus LVT.

155.   During the October 26, 2018 earnings call, Defendants again (falsely) assured investors that the problems were temporary, and claimed that Mohawk's LVT manufacturing problems first developed "in the quarter."  Then, during the February 8, 2019 earnings call, Defendant Lorberbaum promised investors that the Company's inventory rightsizing was finished and that Mohawk would now "be

increasing the production rates to match sales going through the year." And on a call with analysts and investors on April 26, 2019, Defendants once again assured investors that the Company's surplus inventory issue was "behind us" and that Mohawk would match "production with the demand for the most part, going forward."

156.   As Defendants intended, analysts again bought these assurances. Jefferies' analysts issued a report on February 11, 2019 which stated that Mohawk's excess inventory would "dissipate" shortly.  SunTrust Robinson Humphrey analysts wrote in a May 14, 2019 report that Mohawk's production was now expected to "equal sales" and accepted Defendants' excuses for the inventory buildup, writing that "inventory levels look more elevated" than they actually were "due to inflation, some build-up to smooth out start-up actions, and acquisitions."

### B.     Mohawk Again Stuns Investors By Announcing Terrible Q2 2019 Results

157.   On July 26, 2019, Mohawk disclosed that it still had surplus product that necessitated "taking actions" to "manage our inventory" and "improve sales," especially in Flooring North America, which experienced a reported 7 percent year-over-year decline in sales and a more than 4 percent year-over-year decline in operating margin.   These revelations expressly contradicted comments that Defendants had made just three months earlier, on April 26, 2019, when they

claimed that the Company's surplus inventory issue was "behind us" and that Mohawk would match "production with the demand for the most part, going forward."

158.   Defendants also finally confessed that Mohawk's inventory problems and lower sales volume were expected to continue.  They also finally reduced third quarter guidance and noted that the new guidance accounted for "excess inventories" and "reduced production," as well as "lower volume and margins" and "increased competition."  The Company further admitted that investors would have to wait until the following year to see "most of the benefit of the different actions" the Company was taking.

159.   Following these disclosures Mohawk's stock price fell $27.52 per share – an 18 percent drop – resulting in another loss of $2 billion in shareholder value. 4.4 million shares of Mohawk common stock traded hands on July 26, 2019, a 338 percent increase above trading volume in the prior trading session.

160.   This time, analysts across the board downgraded the Company. Evercore ISI lowered its target price for Mohawk's shares in its July 26, 2019 report, noting that "[i]nventory levels have been a significant area of concern for investors over the last several quarters and will persist, as days in inventory rose once again." J.P. Morgan similarly stated in a report issued on July 29, 2019 that "older

headwinds, including . . . reduced production, have persisted if not worsened near term."  SunTrust Robinson Humphrey issued its then strongest statement to date against the Company: "[T]his latest blow pushes [Mohawk's] name back to the starting line."

161.   Investors lost a total of $7.4 billion in market value in just a year as the truth, but not the whole truth, gradually leaked out into the marketplace through a series of partial disclosures.  To date, Mohawk's stock trades at less than $145 per share, a fraction of its $282.61 per share high on November 1, 2017.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### I.   Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2017

162.   On April 28, 2017 – the start of the Relevant Period – Mohawk hosted a conference call with investors to discuss its business operations and financial results for the first quarter of 2017 (the "First Quarter 2017 Investor Call") as well as to review the press release that it filed with the SEC on Form 8-K after the market had closed the day before (the "First Quarter 2017 Press Release").  Both Defendants Lorberbaum and Boykin spoke on Mohawk's behalf during the First Quarter 2017 Investor Call.

163.   During the First Quarter 2017 Investor Call, Defendants made the following statements:

- Attributing the Company's record sales to "doing the right things to make the business grow" and using "the same strategy [they had] been using" to provide results over the previous 5 years.

- Attributing the Company's "first quarter record" operating margin of 12.4%, up 110 basis points over the prior year, to legitimate business factors, including "volume, mix and productivity."

- Attributing the "improvement" in gross margin of 20.8%, which was up 110 basis points, to "productivity of $36 million, volume of $14 million and price/mix of $10 million."

- Attributing the rise in margins to capital investments, reporting that "the capital investments are to increase our product innovation, which allows us to make more differentiated products, which allows us to participate in higher-margin premium categories."

- Stating that the "improvement" in the Flooring North America segment's operating income margin of 10.1%, up 140 basis points, "was supported by productivity of $13 million and volume of $5 million."

- "The continued improvement of our LVT manufacturing process is increasing our capacity and margins."

- When asked "what role carpet played in the margin in the quarter," Defendants replied, "it would be hard to drive the margins up dramatically . . . and leave out such a large part of our business."

- "[O]ur flexible, rigid and commercial LVT collections are being well accepted across all channels."

- Attributing the Company's rising inventories and slow inventory turnover to "geographic expansion and product growth."

164.   During the First Quarter 2017 Investor Call and the First Quarter 2017 Press Release, Mohawk made the following statements:

- Touting its "record" sales and stating that "[i]n the first quarter, Mohawk sales rose approximately 4% . . . to a first quarter record of $2.2 billion."

- Reporting that "[d]uring the quarter, sales in our Flooring North America segment increased 4%."

165.   In the Company's quarterly report for the period ending May 5, 2017 (the "First Quarter 2017 10-Q"), signed by Lorberbaum and Boykin and filed with the SEC, Mohawk and the two signatory Defendants reported the following:

- "Net sales for the three months ended April 1, 2017 were $2,220.6 million."

- For Flooring North America "[n]et sales increased $33.1 million, or 3.7%, to $939.5 million."

- "The increase [in sales] was primarily attributable to higher sales volume of approximately $50 million, or 2%, and the favorable net impact of price and product mix of approximately $16 million."

- For Flooring North America "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $28 million, or 3%, and the favorable net impact of price and product mix of approximately $5 million."

166.   Defendants' statements identified in ¶¶163-65 were false, misleading, and omitted material facts.  Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam.  Having chosen to discuss the reasons for Mohawk's alleged

"record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to inflate sales and meet investor expectations. Defendants' failure to do so rendered these statements false and misleading.

167. Defendants' statements concerning Mohawk's margins were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam and the scheme to produce excess product. Having chosen to discuss the reasons for Mohawk's "record" margins, Defendants were required to inform investors that the Company had achieved those numbers through the deliberate overproduction of product for the express purpose of artificially lowering per unit production costs and thereby driving up margins, and through Defendants' refusal to write-off huge volumes of scrap LVT. Their failure to do so rendered their statements false and misleading.

168. Mohawk's statements that "our flexible, rigid and commercial LVT collections are being well accepted across all channels" were false and misleading because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because

of its defects; and (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty.

169.   It was also false and misleading for Mohawk to state that its rising inventories and slowing inventory turnover were due to "geographic expansion and product growth" without disclosing that its inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

## II.   Defendants' Materially False and Misleading Statements and Omissions During the Second Quarter of 2017

170.   On July 28, 2017, Mohawk hosted a conference call with investors to discuss the Company's financial results for the second quarter of 2017 (the "Second Quarter 2017 Investor Call"), as well as to review the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Second Quarter 2017 Press Release").  During the Second Quarter 2017 Investor Call, Lorberbaum,

Boykin, and Mohawk's President and Chief Operating Officer, William Christopher

Wellborn, spoke on Mohawk's behalf.

171.   During the Second Quarter 2017 Investor Call, Defendants made the

following statements:

- "In the second quarter, Mohawk's performance continued at a record level, generating the highest sales . . . in the company's history" and that "[o]ur businesses continued their exceptional execution, with sales growth of 6% as reported and 8% on a constant days and currency basis."

- "[N]et sales of $2,453,000,000 were an all-time new record, growing 6% as reported and 8% using constant days and foreign exchange."

- Attributing the 60 basis-point year-over-year "improvement" in the Company's operating margin to "$20 million of price/mix and $12 million of productivity."

- "Our inventories were $1,866,000,000, with the inventory days at 109 days for the year.  It increased from 105 last year due to raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses."

- In response to a question concerning Mohawk's growing inventory, attributing it to "chasing demand" and explaining that "[i]t's really made up of a few pieces.  First is right.  As the material costs go up, all of that flows into inventory immediately as the prices go up.  The second is that as we're building our businesses in different places, we're importing products for LVT, ceramic and countertops, so those inventories are going up.  And then finally, the U.S. economy was not quite as robust as we were expecting."

172.   During the Second Quarter 2017 Press Release Mohawk stated:

- Quoting Lorberbaum as stating that "[d]uring the period, Mohawk delivered record results, generating the highest sales . . . in the company's history."

173.   During the Second Quarter 2017 Investor Call and in the Second Quarter 2017 Press Release, Mohawk made the following statements:

- Touting its "record" sales figures.

- "During the quarter, our Flooring North America Segment's sales increased 6%."

174.   Mohawk's quarterly report for the second quarter period ending July 1, 2017 (the "Second Quarter 2017 10-Q"), signed by Defendants Lorberbaum and Boykin, made the following additional statements:

- "Net sales for the three months ended July 1, 2017 were $2,453.0 million, reflecting an increase of $142.7 million, or 6.2%, from the $2,310.3 million reported for the three months ended July 2, 2016."

- "Net sales increased $59.6 million, or 6.1%, to $1,040.3 million for the three months ended July 1, 2017, compared to $980.7 million for the three months ended July 2, 2016."

- "The increase [in sales] was primarily attributable to higher sales volume of approximately $109 million, or 5%, . . . and sales volume attributable to acquisitions of approximately $48 million" and "[a]lso contributing to the increase in sales was the favorable net impact of price and product mix."

- Regarding the Flooring North America segment stating that the "increase [in sales] was primarily attributable to higher sales volume of approximately $39 million, or 4%, and the favorable net impact of price and product mix of approximately $21 million, or 2%."

175.   Defendants' statements identified in ¶¶171-74 were false, misleading, and omitted material facts.  Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the

Saturday Scam.   Having chosen to discuss the reasons for Mohawk's alleged "record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to inflate sales and meet investor expectations.  Defendants' failure to do so rendered these statements false and misleading.

176.   Defendants' statements concerning Mohawk's margins were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam and the scheme to produce excess product.  Having chosen to discuss the reasons for Mohawk's "record" margins, Defendants were required to inform investors that the Company had achieved those numbers through the deliberate overproduction of product for the express purpose of artificially lowering per unit production costs and thereby driving up margins, and through Defendants' refusal to write-off huge volumes of scrap LVT.  Their failure to do so rendered their statements false and misleading.

177.   It was also false and misleading for Mohawk to state that its rising inventories and slowing inventory turnover were due to "raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses," "material costs go[ing] up," "building our businesses in different places," "importing products," and the "U.S. economy," without disclosing that its

inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

## III.   Defendants' Materially False and Misleading Statements and Omissions During the Third Quarter of 2017

178.   On October 27, 2017, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the third quarter of 2017 (the "Third Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Third Quarter 2017 Press Release").  During the Third Quarter 2017 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

179.   During the Third Quarter 2017 Investor Call, Defendants made the following statements:

- Attributing the Company's improved gross margin of 32% to "$63 million of price/mix and $40 million of productivity" and the Company's

improved "operating margin" of 16.2% to "$62 million of price/mix and $49 million of productivity."

- "[W]e expect higher sales with the relief of some of our capacity constraints, enabling us to expand our market position."

- Stating for Flooring North America that "[c]apacity limitations in laminate, LVT and some residential carpet categories constrained our sales."

- Explaining that "production limitations" for Flooring North America "means that we have sold all of the laminate that we could make without putting in new capacity, which is just getting started up . . . . With LVT, we increased the capacity of our LVT through productivity initiatives, so we were selling all of it we could have."

- Concerning Flooring North America, stating "we had constraints in laminate, LVT and some of our residential carpet."

- "Our inventories ended the quarter at $1,911,000,000.  We had 112 days of inventory on hand, with raw material inflation and source product growth impacting the days."

180.   In the Third Quarter 2017 Press Release, Mohawk made the following statements:

- "Net sales for the third quarter of 2017 were $2.4 billion, up 7% in the quarter and 5% on a constant days and currency basis."

- "During the quarter, our Flooring North America segment's sales increased 2% as reported."

- Concerning the Flooring North America segment, stating "[o]ur new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our cost."

181.   During the Third Quarter 2017 Investor Call and in the Third Quarter 2017 Press Release, Mohawk made the following statement:

- Touting its "record" results and stating that "Mohawk delivered record earnings and EPS with sales growing approximately 7%."

182.   In Mohawk's quarterly report for the third quarter period ending September 30, 2017 (the "Third Quarter 2017 10-Q") filed with the SEC, signed by Defendants Lorberbaum and Boykin, Mohawk and the signatory Defendants made the following statements:

- "Net sales for the three months ended September 30, 2017 were $2,448.5 million, reflecting an increase of $154.4 million, or 6.7%."

- Stating that Flooring North America's "[n]et sales increased $23.2 million, or 2.3%, to $1,031.8 million for the three months ended September 30, 2017."

- "The increase [in sales] was primarily attributable to higher sales volume of approximately $42 million, or 2%" and "the favorable net impact of price and product mix of approximately $73 million, or 3%, and the net impact of favorable foreign exchange rates of approximately $40 million, or 2%."

- Stating the following concerning net sales in the Flooring North America segment, "[t]he increase was primarily attributable to the favorable net impact of price and product mix of approximately $41 million, or 4%."

183.   Defendants' statements identified in ¶¶179-82 were false, misleading, and omitted material facts. Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam. Having chosen to discuss the reasons for Mohawk's alleged

"record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to inflate sales and meet investor expectations. Defendants' failure to do so rendered these statements false and misleading.

184.   Defendants' statements concerning Mohawk's margins were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam and the scheme to produce excess product. Having chosen to discuss the reasons for Mohawk's "record" margins, Defendants were required to inform investors that the Company had achieved those numbers through the deliberate overproduction of product for the express purpose of artificially lowering per unit production costs and thereby driving up margins, and through Defendants' refusal to write-off huge volumes of scrap LVT. Their failure to do so rendered their statements false and misleading.

185.   It was false and misleading for Defendants to state that "relief of some of our capacity constraints" would expand sales, that Mohawk was "selling all of [the LVT] we could have," and that "capacity limitations in . . . LVT and some residential carpet categories constrained our sales" when, in reality, and among other things: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent

of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

186.   It was also false and misleading to discuss the reasons for Mohawk's rising inventories and slowing inventory turnover, and to attribute them solely to "raw material inflation and source product growth" without disclosing that its inventory was mounting and turnover slowing, for the same reasons set forth in ¶185.

## IV.   Defendants' Materially False and Misleading Statements and Omissions During the Fourth Quarter of 2017

187.   On February 9, 2018, Mohawk hosted a conference call with investors to discuss its business operations and financial results for the fourth quarter of 2017 (the "Fourth Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Fourth Quarter 2017 Press Release").   During the Fourth Quarter 2017 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

188.   During the Fourth Quarter 2017 Investor Call, Defendants made the following statements:

- Touting its "record" sales and reporting that Mohawk "recorded our best results for the period with sales of $2.4 billion, up 8.5% over the prior year."

- "Over the past 3 years, our strategies of adding new products, increasing our capacities and acquiring new businesses have led to an expanded earnings . . . . Our 2017 results reflect the impact of these strategies . . . ."

- Attributing the Company's success in 2017 to "the unique strategy that combined the best features of a large, well-run public company, a private acquisition firm and a venture capital group."

- In response to an analyst inquiry about the "tangible drivers" for Mohawk's business, stating that: "I think the biggest piece, which wasn't a surprise, we knew there was going to be some pull-forward of sales due to price increases. There's the balancing of the pricing versus the cost and the flow-through and how they actually show up in the fourth quarter. There's the FX rates that changed on us, out of our control within there. In general, the business levels were about what we thought they'd be when we went into them. And we think we have reasonable estimates for the first quarter, given all that's going on."

- Attributing the Company's improvement in gross margin of 31.8% to "price/mix and productivity."

- Stating that Flooring North America segment's operating margin of 16.7%, up 160 basis points, "improved" as a result of "positive price/mix of $21 million and productivity of $22 million."

- Stating that the Company's rising inventory and slowing inventory turnover were attributable to "higher raw material cost, ramp-up of new products and backwards integration."

- "Our inventories were $1,949,000,000 with inventory days at 119 days. Inventories have been impacted by higher raw material cost, ramp-up of new products and backwards integration."

189.   In the Fourth Quarter 2017 Press Release, Mohawk made the following statement:

- "During the quarter, [Mohawk's] Flooring North America Segment's sales increased 3% as reported."

190.   In its February 28, 2018 annual report for the fourth quarter and full year 2017 (the "2017 10-K"), signed by Defendants Lorberbaum and Boykin and filed with the SEC, Mohawk and the signatory defendants made the following statements:

- "Net sales for 2017 were $9,491.3 million, reflecting an increase of $532.2 million, or 5.9%."

- Stating that for Flooring North America, "[n]et sales increased $145.1 million, or 3.8%, to $4,010.9 million for 2017, compared to $3,865.7 million for 2016."

- "The increase [in sales] was primarily attributable to higher sales volume of approximately $245 million, or 3%, . . . the favorable net impact of price and product mix of approximately $218 million, or 2%, and the favorable impact of foreign exchange rates of approximately $69 million, or 1%."

- Concerning the Flooring North America segment, stating that "[t]he increase [in sales] was primarily attributable to higher sales volumes of approximately $39 million, or 1%, and the favorable net impact of price and product mix of $105 million, or 3%."

191.   Defendants' statements identified in ¶¶188-90 were false, misleading, and omitted material facts.  Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam.  Having chosen to discuss the reasons for Mohawk's alleged "record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to

inflate sales and meet investor expectations.  Defendants' failure to do so rendered these statements false and misleading.

192.  Defendants' statements concerning Mohawk's margins were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam and the scheme to produce excess product.  Having chosen to discuss the reasons for Mohawk's "record" margins, Defendants were required to inform investors that the Company had achieved those numbers through the deliberate overproduction of product for the express purpose of artificially lowering per unit production costs and thereby driving up margins, and through Defendants' refusal to write-off huge volumes of scrap LVT.  Their failure to do so rendered their statements false and misleading.

193.  It was also false and misleading for Defendants to discuss the reasons for Mohawk's increased inventory and slowing inventory turnover and solely attribute them to "higher raw material cost, ramp-up of new products and backwards integration" without disclosing that its inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because

of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

194.   Further, the certifications that Defendants Lorberbaum and Boykin provided in the 2017 10-K pursuant to Section 302 of SOX were also false and misleading.  Section 404 of SOX requires public companies to publish information in their annual reports concerning the scope and adequacy of their internal control structure and procedures for financial reporting, and also assess the effectiveness of such internal controls and procedures.  When management identifies a control deficiency, it cannot claim that its internal controls are effective if the control deficiency is deemed to be a material weakness.

195.   Section 302 of SOX requires a public company's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the company's internal controls.  Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, Defendants Lorberbaum and Boykin certified in the 2017 10-K that:

1. I have reviewed this annual report on Form 10-K of Mohawk Industries, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is

reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

196.   These statements, which caused Mohawk securities to trade at artificially inflated prices, were materially false and misleading because Mohawk did not have effective disclosure controls and procedures in place throughout 2017. As further detailed in ¶225, Defendants Lorberbaum and Boykin had been on notice that Mohawk had troubles monitoring and reporting its inventory counts since at least 2016. For example, in its November 10, 2016 quarterly report filed with the SEC, Mohawk disclosed that the Company's controls and procedures were found to be "ineffective" and that the Company was found to suffer from "a material weakness in internal control over financial reporting related to documenting management's inventory control oversight." These problems persisted throughout 2017, as evidenced by, *inter alia*, the Saturday Scam and Mohawk's overrunning its

production lines, reporting damaged LVT as inventory, selling defective LVT, and mass denying legitimate return claims. Mohawk did not have sufficient disclosure controls and procedures to ensure that such material information was reported to investors.

## V.     Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2018

197.   On April 27, 2018, Mohawk hosted a conference call with investors to discuss its business operations and financial results for the first quarter of 2018 (the "First Quarter 2018 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "First Quarter 2018 Press Release"). During the First Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

198.   During the First Quarter 2018 Investor Call, Defendants made the following statements:

- "In the first quarter, we generated sales of $2.4 billion, up 9% over the prior year."

- "In the Flooring North America segment, sales were $950 million compared to $939 million in 2017 with good growth in residential carpet and LVT."

- "Inventories were $2,045,000,000 with inventory days at 116 days, which improved over the fourth quarter. Inventory turns continue to be impacted by increasing inflation and our backwards integration."

199.   In the First Quarter 2018 Press Release, Mohawk made the following statements:

- "Net sales for the first quarter of 2018 were $2.4 billion, up 9% in the quarter and 4% on a constant currency basis."

- "During the quarter, our Flooring North America Segment's sales increased 1%."

200.   In its May 4, 2018 quarterly report for the first quarter period ending March 31, 2018 (the "First Quarter 2018 10-Q"), signed by Defendants Lorberbaum and Boykin and filed with the SEC, Mohawk made the following statements:

- "Net sales for the three months ended March 31, 2018 were $2,412.2 million, reflecting an increase of $191.6 million, or 8.6%."

- For Flooring North America the Company stated that "[n]et sales increased $10.9 million, or 1.2%, to $950.4 million."

- "The increase [in sales] was attributable to higher sales volume of approximately $57 million, or 2%."

- "Also contributing to the increase in sales was the net impact of favorable foreign exchange rates of approximately $99 million, or 4% and the favorable net impact of price and product mix of approximately $36 million, or 2%."

- For Flooring North America, stating that "[t]he increase of $11 million was primarily attributable to the favorable net impact of price and product mix and higher sales volume."

201.   Defendants' statements identified in ¶¶198-200 were false, misleading, and omitted material facts.  Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the

Saturday Scam.  Having chosen to discuss the reasons for Mohawk's alleged "record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to inflate sales and meet investor expectations.  Defendants' failure to do so rendered these statements false and misleading.

202.   It was also false and misleading for Defendants to discuss the reasons for Mohawk's increased inventory and slowing inventory turnover and solely attribute them to "increasing inflation and our backwards integration" without disclosing that its inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

## VI.   Defendants' Materially False and Misleading Statements and Omissions During the Second Quarter of 2018

203.   On July 26, 2018, Mohawk hosted a conference call with investors to discuss its financial results for the second quarter of 2018 (the "Second Quarter 2018

Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Second Quarter 2018 Press Release").  During the Second Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

204.   During the Second Quarter 2018 Investor Call, Defendants made the following statements:

- "During the period, our U.S. LVT sales growth was limited by capacity constraints."
- Attributing the Company's rising inventories and slow inventory turnover to "inflation negatively impact[ing] the [inventory days] calculation."

205.   The statements in ¶204 were false and misleading because in reality, and among other things: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

## VII.   Defendants' Materially False and Misleading Statements and Omissions During the Third Quarter of 2018

206.   On October 26, 2018, Mohawk hosted a conference call with investors to discuss its financial results for the third quarter of 2018 (the "Third Quarter 2018 Investor Call").  During the Third Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

207.   In the Third Quarter 2018 Investor Call, Defendants made the following statements:

- In response to an Evercore ISI analyst who stated "help us understand or break down what we see in the overall inventory number because it still seems kind of high," the Company replied and attributed the Company's level of inventory to "raw material inflation" and stated that the inventory turns got "worse because the raw materials have increased, and it's showing up in the inventory dollars, in addition to having nothing to do with the units as the prices go up."

- Stating that the Company's rising inventories and slow inventory turnover were attributable to "inflation and backwards integration."

208.   The statements in ¶207 were false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's growing inventories and slow inventory turnover and attribute them to "raw material inflation" and "inflation and backwards integration" without revealing that its inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that

was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

## VIII.   Defendants' Materially False and Misleading Statements and Omissions During the Fourth Quarter of 2018

209.   On February 8, 2019, Mohawk hosted a conference call with investors to discuss its business operations and financial results for the fourth quarter of 2018 (the "Fourth Quarter 2018 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Fourth Quarter 2018 Press Release").   During the Fourth Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

210.   During the Fourth Quarter 2018 Investor Call, Defendants made the following statements:

- "We generated sales of $2.4 billion, up 3% as reported or 5% on a constant currency."

- "In the fourth quarter, our Flooring North America segment sales were approximately $974 million, decreasing about 3%."

- "Our inventory was up $340 million from the fourth quarter of last year, with 70% of the increase from new businesses and acquisitions and 30% of the increase from Chinese prebuy and inflation."

211.   In the Fourth Quarter 2018 Press Release, Mohawk made the following statements:

- "Net sales for the quarter were $2,449,000,000 and grew 3% as reported, with the legacy business up almost 1% on a constant exchange rate basis."

- "Net sales for the fourth quarter of 2018 were $2.45 billion, up 3% in the quarter and 5% on a constant currency basis."

212.   In its February 28, 2019 annual report for the fiscal year ending December 31, 2018 (the "2018 10-K"), signed by Defendants Lorberbaum and Boykin and filed with the SEC, Mohawk and the signatory Defendants made the following statements:

- "Net sales for 2018 were $9,983.6 million, reflecting an increase of $492.3 million, or 5.2%, from the $9,491.3 million reported for 2017."

- "The increase was primarily attributable to higher sales volume of approximately $297 million, or 3%, which includes sales volumes attributable to acquisitions of approximately $229 million and legacy sales volumes of approximately $68 million, the favorable net impact of price and product mix of approximately $111 million, or 1%, and the favorable net impact of foreign exchange rates of approximately $85 million, or 1%."

- For Flooring North America, stating that "[n]et sales increased $18.3 million, or 0.5%, to $4,029.1 million for 2018, compared to $4,010.9 million for 2017" and stating that "[t]he increase was primarily attributable to the favorable net impact of price and product mix of $51 million, or 1%."

213. During the Fourth Quarter 2018 Investor Call, the following questions were posed by analysts, and Defendants Mohawk and Lorberbaum responded as follows:

> **Analyst (Michael Glaser Dahl, RBC Capital Markets, LLC)**: The first question, I wanted to go back to the discussion around the inventory. And notwithstanding the uncertainty about whether or not tariffs go into effect at 25% in March, just focused specifically at what's played out over the last couple of months. Yes, you mentioned the Chinese prebuy. Part of that is around the Lunar New Year. Part, presumably for you guys and also maybe your competitors, is really that—to also getting that in ahead of the tariffs. Can you just discuss what you're seeing in terms of both competitor inventory levels and channel inventory levels from your customers in LVT?
>
> **Defendant Lorberbaum**: I can't speak for my competitors because I have no idea. ***But we are raising the inventories for all the reasons you just went through.*** In some cases, we're buying it ahead because of the pricing. In some cases, we're buying it ahead because of the increases. And in some cases, we're buying it ahead to expand our business and footprint and brands we're selling under in each cases. ***So it's all of the above.*** I would imagine the rest of the world is doing the same thing.
>
> \*\*\*
>
> **Analyst (Stephen Kim, Evercore ISI)**: So then my second question relates to inventory. I think you mentioned that you're sort of building – the stuff that you're making in LVT, the new LVT line is going into inventory right now . . . .

**Defendant Lorberbaum**: First is that, I assume you know that the Chinese have a down period in the first of the year, so you have to prebuy ahead of it. The second is we are expecting our sales to go up, so we're building inventories for those product categories before we have any sales. And you have to build enough so you can satisfy the customers. Third is the inventory is also going into all these new businesses we keep talking about. When you start them up, you put in all the raw materials, the inventories and you're building new products before the sales in those too, so the inventories are all there.

214. Defendants' statements identified in ¶¶210-13 were false, misleading, and omitted material facts. Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam. Having chosen to discuss the reasons for Mohawk's alleged "record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to inflate sales and meet investor expectations. Defendants' failure to do so rendered these statements false and misleading.

215. It was also false and misleading for Mohawk to discuss the reasons for its growing inventories and attribute the increase to "new businesses and acquisitions," the "Chinese prebuy," and the other purported reasons given without disclosing that its inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT

that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

216.   Further, the certifications that Defendants Lorberbaum and Boykin provided in the 2018 10-K pursuant to Section 302 of SOX were also false and misleading and were substantially identical to the certifications provided in the 2017 10-K, as set forth in ¶195.  As further detailed in ¶225, Defendants Lorberbaum and Boykin had been on notice that Mohawk had troubles monitoring and reporting its inventory counts since at least 2016.  For example, in its November 10, 2016 quarterly report filed with the SEC, Mohawk disclosed that the Company's controls and procedures were found to be "ineffective" and that the Company was found to suffer from "a material weakness in internal control over financial reporting related to documenting management's inventory control oversight."  These problems persisted throughout 2018, as evidenced by, *inter alia*, the Saturday Scam and Mohawk's overrunning its production lines, reporting damaged LVT as inventory, selling defective LVT, and mass denying legitimate return claims.  Mohawk did not

have sufficient disclosure controls and procedures to ensure that such material information was reported to investors.

## IX.  Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2019

217.   On April 26, 2019, Mohawk hosted a conference call with investors to discuss its business operations and financial results for the first quarter of 2019 (the "First Quarter 2019 Investor Call") as well as the press release that it filed with the SEC on Form 8-K after the market closed on April 25, 2019 (the "First Quarter 2019 Press Release").  During the First Quarter 2019 Investor Call, Lorberbaum, Boykin (who was now a Senior Consultant to Mohawk), Wellborn, and Mohawk's new CFO, Glenn R. Landau, spoke on behalf of Mohawk.

218.   During the First Quarter 2019 Investor Call, Defendants made the following statements:

- "We delivered sales of $2.4 billion, up 1% as reported and up 6% on a constant exchange and days basis."

- "In the Flooring North America segment, sales of $922 million decreased year-over-year by 3% on an as-reported basis or 1.4% on a daily rate."

- "Inventories ended the quarter at $2.3 billion or 126 days . . . due to the ramp up of new plants, acquisitions and higher raw material costs."

- In response to an analyst's question about whether Mohawk had "right-sized the business," Mohawk stated: "The inventory levels were up in the period.  But almost all the inventory increase was up due to new plants that required inventories to support them, the acquisitions that we did last year, the inventory flowing in.  And then with the tariffs that were expected, the

products we're importing from China will dramatically increase the inventories in the period.  For the most part – most of our inventories in the ongoing businesses were kept under control with lower production rates."

219.   In the First Quarter 2019 Press Release, Mohawk made the following statements:

- "Net sales for the first quarter of 2019 were $2.44 billion, up 1% in the quarter and 6% on a constant currency and days basis."

220.   In its May 3, 2019 quarterly report for the fiscal quarter ending March 30, 2019 (the "First Quarter 2019 10-Q"), signed by Defendant Lorberbaum and filed with the SEC, Mohawk and Lorberbaum made the following statements:

- "Net sales for the three months ended March 30, 2019 were $2,442.5 million, reflecting an increase of $30.3 million, or 1.3%, from the $2,412.2 million reported for the three months ended March 31, 2018."

- "The [sales] increase was primarily attributable to higher sales volume of approximately $100 million, or 4.1% which includes sales from acquisitions of approximately $120 million, higher legacy sales volume of approximately $16 million."

- For Flooring North America, stating that "[n]et sales decreased $28.4 million, or 3.0%, to $922.0 million for the three months ended March 30, 2019, compared to $950.4 million for the three months ended March 31, 2018."

221.   Defendants' statements identified in ¶¶218-20 were false, misleading, and omitted material facts.  Mohawk's statements concerning its sales were false and misleading because they omitted that these figures were artificially inflated by the Saturday Scam.  Having chosen to discuss the reasons for Mohawk's alleged

"record" sales, Defendants were required to inform investors that the Company had achieved these sales through the Saturday Scam, which was expressly designed to inflate sales and meet investor expectations. Defendants' failure to do so rendered these statements false and misleading.

222. It was also false and misleading for Defendants to discuss the reasons for Mohawk's surplus inventory and attribute it solely to "the ramp up of new plants, acquisitions and higher raw material costs," "new plants that required inventories to support them, the acquisitions that we did last year," and "tariffs," without disclosing that its inventory was mounting and turnover slowing because, *inter alia*: (i) Mohawk's warehouses were flooded with its domestically produced scrap LVT that was so defective it could not be sold to customers; (ii) roughly 50 percent of the Company's U.S.-made LVT was unsalable scrap coded not to be sold; (iii) retailers were returning 25-50 percent of Mohawk LVT because of its defects; (iv) Mohawk distributors stopped carrying the Company's LVT products because so much of it was faulty; and (v) Mohawk was producing surplus product while knowing there was insufficient demand.

## SCIENTER ALLEGATIONS

223. As thoroughly detailed above, an array of facts support a strong inference that Defendants Lorberbaum, Carson, Boykin, and Mohawk knew, or, at a

minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false and misleading representations to investors.

224.   These facts include, *inter alia*: (i) the Saturday Scam, a classic example of channel stuffing, which was carried out at the express direction of Defendant Carson and other Mohawk senior executives, and with Defendant Lorberbaum's knowledge, and which, simply put, involved Mohawk (falsely) recognizing a "sale" on all ordered products from any quarter in order to artificially boost profits and sales in the then-current quarter; (ii) the scope, frequency, duration, and magnitude of the Saturday Scam, which was implemented at every distribution center across the country, took place on the last Saturday of all but two financial quarters (the second and third quarters of 2018) during the Relevant Period, and involved millions of pounds of products being prematurely "shipped"; (iii) Defendant Lorberbaum was explicitly told in September 2018 by FE1 that Carson had orchestrated and was carrying out the Saturday Scam to artificially inflate Mohawk's financial figures; (iv) Lorberbaum fired Carson within weeks of learning about Carson's fraudulent behavior from FE1 and after a thorough internal investigation into FE1's assertions about Carson; (v) following the internal investigation, Lorberbaum continued to conceal the fraudulent practices that had artificially boosted Mohawk's profits, sales, and margins, failed to correct Mohawk's prior false and misleading statements and

omissions concerning its financial figures and business practices, and continued the widespread fraudulent practices – *i.e.*, the Saturday Scam, overrunning production lines, reporting damaged LVT as inventory, selling defective LVT, and mass denying legitimate return claims – all in order to continue to artificially boost Mohawk's financial figures; (vi) Mohawk overran production lines and manufactured product beyond any level of actual sales demand – at the direction of Defendant Carson and other Mohawk senior executives – in order to inflate the Company's profits and margins and satisfy market expectations; (vii) the size and scope of Mohawk's scrap LVT buildup, and the Company's extensive efforts to store (conceal) this product in over a hundred trailers and then two massive warehouses comprising 300,000 square feet; (viii) Mohawk's top executives, including but not limited to, Lorberbaum and Carson, attended meetings and received, reviewed, and had access to reports and data – including the master reports, daily divisional reports, and executive dashboard packets – which showed spikes in sales and deliveries on the last Saturday of the quarter and a spike in returns in the subsequent quarter, and discussed Mohawk's LVT manufacturing problems; these meetings and reports undermined Defendants' representations to investors about Mohawk's profits, sales, and inventories; (iv) Defendants' false and misleading statements and omissions concerned Mohawk's biggest threat, LVT, and the Company's most profitable

business segment, Flooring North America; indeed, Lorberbaum explained to investors in a letter accompanying Mohawk's annual report for 2016 that LVT was his "particular area of focus" as it was "one of the flooring industry's newest and fasted growing products"; and (x) Defendants made false and misleading statements concerning Mohawk's profits, sales, and inventories in direct response to probing questions from analysts and investors.

225.   Additionally, Defendants Lorberbaum and Boykin had been on notice since at least 2016 that Mohawk had troubles monitoring and reporting its inventory counts.  For example, in its November 10, 2016 quarterly report filed with the SEC, Mohawk disclosed that the Company's controls and procedures were found to be "ineffective" and that the Company was found to suffer from "a material weakness in internal control over financial reporting related to documenting management's inventory control oversight."  This material weakness affected the entire reporting structure for inventories, including "the design, operation and documentation of internal controls related to the monitoring of inventory cycle counts and the valuation of obsolete inventory at two of the Company's divisions" and was so severe that the Company had to publicly amend its Form 10-K for the fiscal year ended December 31, 2015.  Following this incident, Lorberbaum and Boykin were personally responsible for "updating policies that require specific monitoring

activities occur at defined levels and management's conduct of monitoring activities for inventory cycle counts and the valuation of obsolete inventory in these divisions be evidenced upon completion."   Thus, this further establishes Defendants Lorberbaum and Boykin's scienter as to the Company's fraudulent schemes of overproducing product and misclassifying defective LVT as inventory.

226.   Further, Defendants Lorberbaum and Carson both had personal financial interests to artificially increase Mohawk's stock price and misrepresent its financial results.   Pursuant to the Company's published Executive Compensation Program, the Company had a "target" EPS of $12.64 for 2017 and a "target" EPS for the Flooring North America segment of $4.30 for 2017.   To the extent the Company's reported EPS exceeded these amounts in 2017, Defendants Lorberbaum and Carson would receive larger incentive compensation.

227.   As a result of the Company's fraudulent schemes, in 2017 Mohawk reported EPS of $13.61, as well as EPS of $4.52 for the Flooring North America division.   As a consequence, both Lorberbaum and Carson were deemed to have performed at 167 percent and 147 percent above their personal "target" levels, respectively, and both received excessive bonuses.   Specifically, in 2017 Lorberbaum received an annual incentive package of $3.84 million, along with a base salary of $1.17 million – for a total of $5.01 million.   For the same year Carson

received an incentive award of approximately $700,000, stock worth over $890,000, and a base salary of $634,995 – for a total of $2.23 million.  Defendants' personal financial motivation to misrepresent the Company's sales and thereby increase Mohawk's EPS, provides additional support for a strong inference of scienter.

## PRESUMPTION OF RELIANCE

228.   Plaintiff intends to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period; (b) the omissions and misrepresentations were material; (c) Mohawk common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Mohawk common stock; and (e) Plaintiff purchased Mohawk common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

229.   The market for Mohawk stock was open, well-developed and efficient at all relevant times.   As a result of the aforementioned materially false and misleading statements, Mohawk common stock traded at artificially inflated prices during the Relevant Period.  The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations

and omissions concerning Mohawk's "record" financial figures, ballooning inventory levels, and its LVT manufacturing problems.

230.   At all relevant times, the market for Mohawk common stock was efficient for the following reasons, among others:  (a) Mohawk filed periodic reports with the SEC; (b) Mohawk's common stock was listed and actively traded on the NASDAQ; (c) numerous analysts followed Mohawk; and (d) Mohawk regularly communicated with public investors through established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

231.   Plaintiff purchased Mohawk common stock in reliance on the market price of Mohawk common stock, which reflected all the information in the market, including Defendants' misstatements and omissions.

## **LOSS CAUSATION**

232.   As the truth about Mohawk's financial figures, inventory, and LVT production problems gradually and slowly leaked into the market, the price of Mohawk common stock dropped precipitously.

233. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff. During the time that Plaintiff purchased Mohawk common stock, as set forth in Exhibit A, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.

234. As a series of partial but inadequate disclosures were issued correcting the prior false and misleading statements and omissions with respect to Mohawk's financial figures, inventory, and LVT manufacturing troubles – and as the risks previously concealed by Defendants' material misstatements and omissions gradually materialized – the artificial inflation boosting Mohawk's stock was removed and the price of Mohawk stock declined precipitously, thereby damaging Plaintiff. That artificial inflation was removed on October 26, 2018 and July 26, 2019 in direct response to information revealed in a series of disclosures, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions. These disclosures and/or materializations of risks divulged information that slowly corrected Defendants' prior misrepresentations and omissions of material fact, and/or disclosed facts Defendants misrepresented or omitted that were a significant factor in causing Plaintiff's economic loss. The October 26, 2018 and July 26, 2019 disclosures revealed to investors the results of the Company's

suspension of the Saturday Scam, the materialization of the risk that the Company's numerous deceptive efforts to artificially boost its financial performance were not sustainable, the manufacturing problems involving the Company's LVT, the Company's massive overproduction and excess inventory, and its failure to compete in the manufacture and sale of LVT.

235.   None of these revelations alone was sufficient to fully remove the inflation from Mohawk's stock price because each only partially revealed Mohawk's financial state, which had been concealed from or misrepresented to Plaintiff. Further, the corrective impact of the disclosures alleged herein was weakened by Defendants' continued reassuring statements and failure to fully disclose the truth.

236.   The timing and magnitude of the declines in Mohawk's share price negate any inference that Plaintiff's losses were caused by macroeconomic or industry factors, changed market conditions, or Company-specific factors distinct from Defendants' wrongful conduct.

## NO SAFE HARBOR

237.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking

statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Mohawk who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants

238.  Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

239.  Count I is brought against Defendants Mohawk, Lorberbaum, Carson, and Boykin for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

240.   Defendants Mohawk, Lorberbaum, Carson, and Boykin, directly and indirectly, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to: (a) deceive the investing public, including Plaintiff, as alleged herein; (b) artificially inflate and maintain the market price of Mohawk common stock; and (c) cause Plaintiff to purchase Mohawk common stock at artificially inflated prices, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).   Defendants Mohawk, Lorberbaum, Carson, and Boykin, directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein.

241.  By virtue of their high-level positions at the Company and on Mohawk's board of directors (the "Board"), Lorberbaum, Carson, and Boykin were authorized to make public statements, and made public statements on Mohawk's behalf.  These senior executives and Board members were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

242.   In addition, Defendants Mohawk, Lorberbaum, Carson, and Boykin had a duty to disclose (a) truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete, and accurate information; and (b) in Mohawk's periodic filings with the SEC, under Item 303 of Regulation S-K, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

243.   Defendants Mohawk, Lorberbaum, Carson, and Boykin acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.   Defendants Mohawk, Lorberbaum, Carson, and Boykin's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Mohawk's operations, business, performance and prospects from the investing public, including misrepresenting the truth about Mohawk's financial figures, inventory, the problems with its LVT production, and the effectiveness of Mohawk's disclosure controls and procedures.   By concealing these material facts

from investors, Defendants Mohawk, Lorberbaum, Carson, and Boykin supported the artificially inflated price of Mohawk's common stock.

244.   The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Mohawk's common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff purchased Mohawk common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Mohawk's securities substantially declined.

245.   At the time of the material misrepresentations alleged herein, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Plaintiff known the truth with respect to the business, operations, performance and prospects of Mohawk, which was concealed by Defendants, Plaintiff would not have purchased Mohawk common stock, or if it had purchased such stock, it would not have done so at the artificially inflated prices that it paid.

246.   By virtue of the foregoing, Defendants Mohawk, Lorberbaum, Carson, and Boykin have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

247.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in connection with its transactions in the Company's securities.

248.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the Class Action complaint against Defendants, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## COUNT II

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Against All Defendants

249.   Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

250.   Count II is brought against Defendants Mohawk, Lorberbaum, Carson, and Boykin for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rules 10b-5(a) and 10b-5(c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

251.   Defendants Mohawk, Lorberbaum, Carson, and Boykin, directly and indirectly (i) employed devices, schemes, and artifices; and (ii) engaged in acts, practices, and courses of business, in an effort to: (a) deceive the investing public, including Plaintiff, as alleged herein; (b) artificially inflate and maintain the market price of Mohawk common stock; and (c) cause Plaintiff to purchase Mohawk common stock at artificially inflated prices, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c).  Defendants Mohawk, Lorberbaum, Carson, and Boykin, directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to employ and engage such fraudulent devices, schemes, artifices, acts, practices, and courses of business, which included, *inter alia*: the Saturday Scam and Mohawk's overrunning production lines, reporting damaged LVT as inventory, selling defective LVT, and mass denying legitimate return claims.

252.   Defendants Lorberbaum, Carson, and Boykin each had direct, indirect, and/or supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the foregoing fraudulent devices, schemes, artifices, acts, practices, and courses of business.  As thoroughly detailed above, Defendants Lorberbaum, Carson, and Boykin had knowledge of and/or recklessly disregarded these fraudulent schemes and practices

as well.  Defendants' participation in such schemes and practices, as set forth above, artificially inflated the market price of Mohawk's common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the Defendants' deceptive conduct, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff purchased Mohawk common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Mohawk's securities substantially declined.

253.  At the time of the deceptive conduct alleged herein, Plaintiff was ignorant of it.  Had Plaintiff known the truth with respect to the business, operations, performance and prospects of Mohawk, which was concealed by Defendants, Plaintiff would not have purchased Mohawk common stock, or if it had purchased such stock, it would not have done so at the artificially inflated prices that it paid.

254.  By virtue of the foregoing, Defendants Mohawk, Lorberbaum, Carson, and Boykin have violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder.

255.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in connection with its transactions in the Company's securities.

256.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the Class Action complaint against Defendants, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### COUNT III

**Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

257.   Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

258.   Count III is asserted against Defendants Lorberbaum, Carson, and Boykin and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

259.   Each of Defendants Lorberbaum, Carson, and Boykin was a controlling person of Mohawk within the meaning of Section 20(a) of the Exchange Act.

260.   By virtue of their high-level positions and Board membership, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge or reckless disregard of the materially false and misleading statements and material omissions disseminated to the investing

public, Defendants Lorberbaum, Carson, and Boykin had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

261.   Defendants Lorberbaum, Carson, and Boykin were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Lorberbaum, Carson, and Boykin each had direct and/or supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

262.   Defendants Lorberbaum, Carson, and Boykin culpably participated in Mohawk's violations of Section 10(b) and Rule 10b-5 with respect to Counts I and II.

263.   By reason of the conduct alleged in Counts I and II, Mohawk is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder, and Defendants Lorberbaum, Carson, and Boykin are liable pursuant to Section 20(a) based on their control of Mohawk.

264.   Defendants Lorberbaum, Carson, and Boykin are liable for the aforesaid wrongful conduct, and are liable to Plaintiff for the substantial damages suffered in connection with its purchases of Mohawk common stock.

265.   Taking into account, *inter alia*, tolling of the limitations period by the filing of the Class Action complaint against Defendants, Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## <u>COUNT IV</u>

### Violations of Georgia RICO, O.C.G.A. Sections 16-14-4(a) and 16-14-4(b) Against All Defendants

266.   Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

267.   Each Defendant is a "person" within the meaning of O.C.G.A. § 16-14-4.

268.   Defendant Mohawk is an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affects commerce in the State of Georgia and elsewhere.

269.   Alternatively, Lorberbaum, Boykin, and Carson, who operated as an "association in fact," comprise an "enterprise" within the meaning of O.C.G.A. § 16-

14-3(6), which affects commerce in the State of Georgia and elsewhere. Such "association in fact" is an ongoing organization organized for the purpose of perpetrating an illegal scheme to defraud Plaintiff. Such an enterprise is controlled by Lorberbaum, Boykin, and Carson, and regularly carries out its function of perpetrating the fraudulent and illegal schemes of Lorberbaum, Boykin, and Carson. The enterprise existed at all relevant times and still exists.

270.   Lorberbaum, Boykin, and Carson are persons who, through a pattern of racketeering activity, acquired and maintained, directly or indirectly, an interest in or control of personal property including monies paid by Plaintiff for its investments in Mohawk. Such pattern of racketeering activity included at least two acts of "racketeering activity," including mail and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. § 1961(1).

271.   Mohawk has also conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise described in this Complaint through at least two acts of "racketeering activity," including mail and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. § 1961(1).

272.  Defendants knowingly, intentionally, and willfully acquired or maintained an interest in funds belonging to Plaintiff, including monies paid by Plaintiff for its investments in Mohawk, through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiff.  Defendants' enterprise existed for the sole improper purpose of furthering a scheme to defraud Plaintiff and others, and the enterprise continues to carry on efforts to conceal its prior activities against Plaintiff.

273.  Indeed, from at least 2017 and continuing to the present in Georgia and elsewhere, by continuing to keep secret their fraudulent schemes, Defendants have violated (1) O.C.G.A. § 16-14-4(a), through a pattern of racketeering activity, to acquire or maintain, directly or indirectly an interest in, or control of Plaintiff's personal property, including the monies used to invest in Mohawk common stock; and (2) O.C.G.A. § 16-14-4(b), by being employed by or associated with an enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

274.  Defendants intentionally and willingly devised and participated in a scheme to defraud Plaintiff of funds, and knowingly and intentionally engaged in racketeering acts by using the interstate mails, in violation of 18 U.S.C. § 1341, and

interstate wires, in violation of 18 U.S.C. § 1343, as integral and essential devices to advance, further, and facilitate that scheme.

275.   The discrete acts of racketeering activity of Defendants constitute a pattern of racketeering activity in that they have committed at least two acts of racketeering activity that had the same or similar purposes, results, participants, victims, or methods of commission.  The discrete acts of racketeering activity of Lorberbaum, Boykin, and Carson with respect to Mohawk also evidence or demonstrate that they are engaged in a pattern of racketeering activity.

276.   Because Defendants unlawfully acquired money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a), and because Defendants conducted and/or participated in the affairs of an enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b), and because Plaintiff was directly injured by the unlawful conduct of Defendants, Plaintiff is entitled to three times the amount of its actual damages, plus attorneys' fees, costs, and investigative expenses, plus punitive damages in an amount sufficient to deter Defendants from engaging in similar conduct in the future.

277.   As a direct and proximate result of Defendants' racketeering activity, Plaintiff has suffered injury to its business and property.  For example, and without limitation, Defendants used interstate wires to circulate materially false and

misleading information regarding Mohawk's financial performance and business operations to Plaintiff, which was purposefully misleading and which Plaintiff justifiably relied on to its detriment.

278.   These acts caused Defendants to acquire and maintain an interest in funds belonging to Plaintiff, including monies paid by Plaintiff for its investments in Mohawk.

279.   The foregoing acts of mail fraud and wire fraud constitute a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8), are not isolated incidents, and were all undertaken in furtherance of schemes that are interrelated in that, *inter alia*: (i) they had the similar purposes of improperly defrauding Plaintiff out of millions of dollars; (ii) they had similar participants, *i.e.*, Defendants Mohawk, Lorberbaum, Boykin, and Carson; and (iii) they had similar methods of commission and results.

280.   The foregoing racketeering acts also illustrate continuity and the threat of continuity, moreover, in that they have come to reflect Defendants' regular way of doing business and Defendants used the misappropriated funds in connection with their ongoing ventures.

281.   Defendants, acting in concert with one another and others, have engaged in a pattern of racketeering activity as defined in O.C.G.A. § 16-14-3(8)

and acquired personal property, including money, belonging to Plaintiff in violation of O.C.G.A. §§ 16-14-4(a) and 16-14-4(b).

282.   By direct and proximate reason of Defendants' pattern of racketeering activity and the predicate acts it comprises, and as a result of Defendants' violations of O.C.G.A. § 16-14-4, Plaintiff has suffered actual, consequential, and other damages to its business and property in an amount to be proven at trial.

283.   Plaintiff has been injured in its business and property by reason of Defendants' racketeering activities in violation of O.C.G.A. §§ 16-14-4(a) and 16-14-4(b).  Plaintiff is entitled to recover from Defendants, jointly and severally, compensatory damages equal to three times the amount of actual damages sustained by Plaintiff, punitive damages in an amount to be determined at trial by the enlightened conscience of the jury, and attorneys' fees and the investigation and litigation costs reasonably incurred by Plaintiff in this action.

284.   In violating the Georgia RICO statute, Defendants have acted in bad faith and are thereby liable for Plaintiff's attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## COUNT V

**Violations of Georgia RICO Conspiracy, O.C.G.A. Section 16-14-4(c)
Against All Defendants**

285.   Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

286.   Defendants   Mohawk,   Lorberbaum,   Boykin,   and   Carson,   in combination with one or more other persons identified herein, agreed and conspired to violate O.C.G.A. §§ 16-14-4(a) and 16-14-4(b).

287.   In particular, Defendants agreed with each other and with such persons to acquire or maintain an interest in or control of Plaintiff's purchase of Mohawk common stock as well as conduct and participate in the conduct of the affairs of Mohawk, through a pattern of racketeering activity, including wire and mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C § 1343.

288.   Defendants and the persons with whom they conspired knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate O.C.G.A. §§ 16-14-4(a) and 16-14-4(b) in violation of O.C.G.A. § 16-14-4(c).

289.   Defendants were an enterprise as that term is defined in O.C.G.A. § 16-14-3(6); that is, a group of individuals and legal entities, foreign and domestic,

associated in fact for the common purpose of fraudulently acquiring the assets of Plaintiff.  The enterprise existed at all relevant times and still exists.

290.   The enterprise existed and exists (to the extent that Defendants have continued to keep their fraudulent schemes a secret) for the sole improper purpose of furthering a scheme to defraud Plaintiff and others, and the enterprise continues to carry on efforts to conceal its prior activities against Plaintiff.

291.   Indeed, from at least 2017 and continuing to the present (by continuing to keep secret their fraudulent schemes), Defendants unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with each other, and with other persons, to violate (1) O.C.G.A. § 16-14-4(a), through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, an interest in, or control of Plaintiff's personal property, including the monies it invested in Mohawk common stock; and (2) O.C.G.A § 16-14-4(b), by being employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

292.   The improper purpose and common objective of the conspiracy was to acquire for Defendants the Plaintiff's assets to use for Defendants' benefit and the benefit of others.

293.   At the inception and during the course of this conspiracy, Defendants and those employed by or associated with the enterprise, each personally agreed to the overall objective of the conspiracy or to commit two racketeering acts.

294.   The pattern of racketeering activity through which Defendants and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the enterprise in furtherance of their fraudulent scheme consisted, among other things, of multiple acts of mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.

295.   These activities took place in, among other places, Georgia, and affected interstate and foreign commerce.

296.   Each co-conspirator aided and abetted and rendered substantial assistance in the accomplishment of the scheme or artifice complained of herein.  In taking the actions set forth above, each co-conspirator acted deliberately and while aware that the conduct in question would substantially assist the accomplishment of violations of the law.  Each co-conspirator was aware of making a contribution to the conspiracy, common enterprise, and the common course of conduct complained of above.

297.   Each co-conspirator participated in, aided and abetted, and conspired to accomplish the illegal conduct alleged herein, in order to obtain Plaintiff's assets and to enrich the enterprise and its members at the expense of Plaintiff.

298.   As a direct and proximate result of said conspiracy, the overt acts taken in furtherance thereof, and the violations of O.C.G.A. § 16-14-4(c), Plaintiff has been injured in its business and property by reason of the conspiracy in an amount to be proven at trial.

299.   In their conspiracy to violate RICO, Defendants have acted in bad faith and are thereby liable for Plaintiff's attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

(a)   Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)   Awarding Plaintiff its reasonable costs and expenses incurred in this action; and

(c)   Awarding such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

The Plaintiff hereby demands a trial by jury as to all issues so triable.

DATED: April 26, 2022   /s/ Robert H. Smalley, III
         Robert H. Smalley, III
         Georgia Bar No. 653405
         McCamy, Phillips, Tuggle & Fordham LLP
         P.O. Box 1105
         Dalton, Georgia 30722-1105
         Telephone: (706) 278-4499
         rsmalley@mccamylaw.com

         Thomas E. Redburn, Jr. (*pro hac vice* forthcoming)
         Maya Ginsburg (*pro hac vice* forthcoming)
         Joshua Nelson (*pro hac vice* forthcoming)
         LOWENSTEIN SANDLER LLP
         1251 Avenue of the Americas
         New York, New York 10020
         Telephone: (212) 262-6700
         Facsimile: (212) 262-7402
         tredburn@lowenstein.com
         mginsburg@lowenstein.com
         jnelson@lowenstein.com

         *Counsel for Plaintiff Fir Tree Value*
         *Master Fund, L.P.*

## **CERTIFICATE OF SERVICE**

I certify that on this 26th day of April, 2022, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.  I further certify that this document has been prepared in Times New Roman font (14 pt.) and formatted in accordance with the Local Rules of the United States District Court for the Northern District of Georgia.

/s/ Robert H. Smalley, III